[Civ. No. 8911. First Appellate District, Division Two.—September 13, 1934.]

A. J. RAISCH, Appellant, v. COUNTY OF MONTEREY (a Body Politic and Corporate, of the State of California), Respondent.

J. A. Bardin, J. T. Harrington and Sullivan, Roche, Johnson & Barry for Appellant.

Wyckoff, Gardner & Parker and Harry Noland, District Attorney, for Respondent.

STURTEVANT, J.—In an action to recover an alleged balance due under a construction contract the trial court made findings in favor of the defendant and from the judgment entered thereon the plaintiff has appealed and has brought up typewritten transcripts.

The plaintiff alleged a contract for an agreed price in his first count and he alleged the reasonable value in his second count. In its answer the defendant denied that there was any balance due, alleged full payment and discharge, and alleged that the controversy arose out of a written contract which it pleaded *in haec verba*. On the trial it was the theory of the plaintiff that the written contract provided the terms of the contract and a specified sum for its performance and that it also provided for the payment of the additional sum of $1 per yard if, by order of the defendant's agent, the county surveyor, the plaintiff should lay the concrete road base in strips, one-half at a time. On the other hand, it was the contention of the defendant that although the general printed specifications contained a passage, as claimed by the plaintiff, such passage was subordinate to and gave way in the presence of certain special written specifications inconsistent therewith, and further, even though the contract contained the provisions claimed by the plaintiff, that the plaintiff never came within its provisions and is not entitled to any relief thereunder.

That the contract is ambiguous is manifest. That both parties so viewed the instrument appears from the fact that before the plaintiff made a bid and several times thereafter the representative of the plaintiff deemed it necessary to call, and therefore called on the county surveyor of the defendant county and asked for his interpretation of subdivision "K" of section 28 of the printed specifications. That officer freely stated his interpretation. It also appears that before the bid was let the members of the board of supervisors, the county surveyor, and the plaintiff's representative held a meeting at which said clause was discussed and the plaintiff was specifically advised that the defendant

would not pay the dollar charge provided in said subdivision "K". The ambiguity arose in this manner. In framing the contract a printed form of specifications was used. That form contains over four hundred folios. It covers specifications of roads of various types, also of bridges, etc. To it are annexed certain special specifications comprising about thirty-five folios. The latter contained among other provisions the following:

"In case of conflict between these Special Provisions and the Standard Specifications, the Special Provisions shall take precedence over and be used in lieu of such completed portions. . . .

"Section 6—Maintaining Traffic.

"The Contractor shall conduct his operations so that all traffic coming from ranches facing along the road between the Hilltown Bridge and the Monterey-Castroville road and all traffic coming from any roads leading into the Salinas-Monterey road may be cared through construction without interruption and with as little inconvenience to said travel as possible. . . .

"All through traffic over the Salinas-Monterey road shall be detoured over the Monterey-Castroville road and signals and lights with proper signs shall be maintained by the contractor at his expense at the junction of the Monterey-Castroville road and the Monterey-Salinas road, and at a point southeasterly from the Hilltown Bridge. . . .

"(i) The pavement shall be poured in two ten foot sections, and a cold joint left between the sections. The edges along the cold joint shall be rounded as shown on plan." On the other hand the general specifications contained a passage as follows:

"Placing Concrete Pavement. . . .

"(k) Half Width Construction.—Where ordered by the County Surveyor, concrete pavement shall be constructed one-half (½) width at a time and the roadway opposite the side under construction shall at all times be kept clear and open to public traffic.

"No portion of the equipment used for mixing the concrete for pavement shall be allowed to stand on or project over that portion of the roadbed open to public traffic as herein provided.

"Concrete work shall be adequately barricaded longitudinally to protect the work and safeguard the public traffic.

"For all pavement ordered placed one-half (½) width at a time, the Contractor will be paid one dollar ($1.00) per cubic yard in addition to the contract price for Class 'A' Portland cement concrete pavement, when not otherwise provided in the Special Provisions." The general specifications also provided:

"Section 4—Scope of Work. . . .

"The Contractor shall do such extra work and furnish such materials as may be required for the proper completion or construction of the work contemplated and he shall do no extra work except upon written order from the County Surveyor, and in the absence of such written order he shall not be entitled to payment for such extra work. All bills for extra work done shall be filed in writing with the County Surveyor." Also they provided, section 5, subdivision (a) that the county surveyor should decide " . . . all questions which may arise as to the interpretation of the plans and specifications . . . (and) His decision shall be final. . . . " They further provided:

"Section 5. Control of the Work. . . .

" (d) Coordination of Plans, Specifications and Special Provisions.—These specifications, the plans, special provisions, and all supplementary documents are essential parts of the contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be cooperative, to describe and provide for a complete work. Plans shall govern over specifications, special provisions shall govern over both specifications and plans.

" (e) Interpretation of Plans and Specifications.—Should it appear that the work to be done or any of the matters relative thereto, are not sufficiently detailed or explained in these specifications and the Special Provisions, the Contractor shall apply to the County Surveyor for such further explanations as may be necessary and shall conform to the same as part of the contract so far as may be consistent with the original specifications; and in the event of any doubt or question arising respecting the true meaning of the specifications, reference shall be made to the Board of Supervisors, whose decision thereon shall be final. . . .

"Section 7. Legal Relations and Responsibility to the Public. . . .

"(e) . . . Residents along the road must be provided for as far as practicable. Convenient access to driveways, houses and buildings along the line of the work must be maintained and temporary approaches to crossings or intersecting highways shall be provided and kept in good condition, where required by the County Surveyor. . . .

"Joints. . . .

"(p) Contract Joints shall be formed by pouring the concrete on one side of the joint and allowing it to set before the adjacent concrete is placed. . . .

"Basis of Payment.

"(hh) . . . All concrete shall be measured in place in accordance with the dimensions shown on the plans and cross-section and as given in the Special Provisions. Allowance will be made for the theoretical quantities to which shall be added one-half ($\frac{1}{2}$) the volume of concrete placed due to unavoidable construction of low subgrade. No other allowance for concrete will be made unless placed in accordance with written instructions specifying definite locations, previously given by the County Surveyor." With the issues so made up and presented the trial proceeded.

At this time the plaintiff makes two points. Both involve the rulings admitting evidence of oral conversations claimed by the plaintiff to vary the terms of a written contract. These points we will now take up in the order in which they are stated in the plaintiff's brief.

■ Mr. Quimby, the managing agent of the plaintiff, was sworn as a witness by the plaintiff. He testified that he was in charge of the construction under the contract as the representative of the plaintiff and that the concrete was poured one-half at a time; that he had several conversations with Howard Cozzens, the county surveyor of Monterey County; that in one conversation something was said as to how the concrete should be poured. Continuing the witness testified:

"Q. What was said in that regard at that conversation? A. I asked him if he wished it poured that way. He countered, and asked me if it were not the most practical way to do it. I replied that I thought it was, that there were other methods that were used by the state, and he

himself mentioned one other method, but he didn't think it was as practical as the other. Well I said 'Then you desire it poured one-half at a time, I must order my equipment to fit the job'; and he said he desired it that way, thought it was the most practical way. By the Court. Well what was the one other method he mentioned? A. The other method was setting a strip under—well it is the same method that was used on the Bay Shore, said we have here recently, I have a drawing of it. Q. What is called a weakened blade? A. A longitudinal weakened blade joint. They set a little strip, and he described it to me at the time, 4 or 5 inches high, a little redwood strip, blade, and force little sticks in, leaving it in underneath, and then they insert above it a blade, long thin blade, that practically meets, cannot entirely meet, and leave that in there until this initial set takes place. These blades, you have to have a number of them, and move them ahead as the concrete sets sufficiently to remove them without it running together and binding. By the Court. And in that way the two sections may be poured at the same time, and you still get a cold joint? A. You still get the same results. Q. Now you state that the work then proceeded, the pouring being poured one-half at a time? A. Yes."

Pointing to that testimony the plaintiff, in the trial court claimed, and he now claims, that the statements made by the county surveyor in that conversation constituted an order by him and brought the plaintiff within the scope of the above-mentioned provision contained in the aforementioned printed specifications. In other words, the plaintiff tendered such evidence as showing an order made by the county surveyor. In controverting that claim by the plaintiff, on cross-examination the defendant asked certain questions and the following proceedings were had:

"Q. State what that conversation was the Saturday before the bids were opened. A. I called the County Surveyor's, Mr. Cozzens', attention to the clause that called for the $1 added cost if poured in one-half width. Q. And what did you say to him about that clause? A. Why I asked him if he wanted me to figure it that way. Q. What did he say? A. He said that he had not intended it that way. Q. That he did not intend you were to get the dollar, in other words, is that it? A. I think that it is. . . .

Q. Didn't they make it plain to you that it was their interpretation, and the engineer's that you couldn't get the dollar on this job? By Mr. James. I object to that on the further ground it calls for the conclusion of the witness. By the Court. Objection sustained. A. That impression I was left yes, I rather think that was their intent. Q. They were telling you you were not to have the dollar; that was before the signing of the contract, wasn't it? A. Yes. Q. And didn't you tell them you didn't expect it? A. Well I don't recall that definite statement. . . . Q. Well is that your answer to my question, as to whether you did assent to their statement, that you were not to have the dollar, that you said that you knew it, or words to that effect? A. Yes. Q. Did you say words to that effect, that you understood that you were not to have the dollar? A. I said that I understood Mr. Cozzens did not intend the dollar to be paid, outside, perhaps, if it was asked me now, they told me, they asked me if I understood it, if it was put in that way, I probably did, because he had told me that before. Q. And you assented to that proposition right then did you not? A. Whatever was said there I agreed to, yes sir. Q. Yes, you agreed to what they said, that you were not to have the dollar, and that interpretation of this contract and specifications, did you not? A. I don't think that was brought out to that length at all. Yes, I would say yes, I assented.'' Other similar proceedings were had. The plaintiff duly objected, but his objections were overruled.

We see no error in the rulings. The cross-examination was within the bounds of the direct examination, the subject matter was clearly pertinent to the issue on trial, and the evidence was competent proof. Nor did it tend to vary the terms of a written instrument as will later appear.

■ The second point which the plaintiff presents is this. In presenting its case the defendant called as witnesses the county officers who had been present at the above-mentioned conversations and introduced their evidence as to what had been said. The plaintiff objected to each part. His objections were overruled and he assigns the rulings as error. We find no error in any one of the rulings. As to the ·conversation, evidence of which was introduced by the plaintiff, the defendant had the clear right to introduce evidence as to its theory regarding that specific conversa-

tion. The other conversations were clearly a mere portrayal of the circumstances surrounding the parties when they entered into the contract and as such were admissible. (Civ. Code, sec. 1647.) In *Balfour* v. *Fresno C. & I. Co.*, 109 Cal. 221, at page 225 [41 Pac. 876], the court said:

"If the language of the contract be, as defendant contends, plain and unambiguous, and susceptible of but one construction, then the objection was good, and the evidence properly excluded. If, however, the language employed be fairly susceptible of either one of the two interpretations contended for, without doing violence to its usual and ordinary import, or some established rule of construction, then an ambiguity arises, which extrinsic evidence may be resorted to for the purpose of explaining. This is not allowing parol evidence for the purpose of varying or altering the contract, or of putting a different sense and construction upon its language from that which it would naturally bear, but for the purpose of showing the circumstances under which the language was used, and applying it according to the intention of the parties. 'The true interpretation of every instrument being manifestly that which will make the instrument speak the intention of the party at the time it was made, it has always been considered an exception, or perhaps a corollary, to the general rule above stated, that when any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument itself.' (*Sandford* v. *Newark etc. R. R. Co.*, 37 N. J. L. 1, 3.) For the purpose of determining what the parties intended by the language used, it is competent to show not only the circumstances under which the contract was made, but also to prove that the parties intended and understood the language in the sense contended for; and for that purpose the conversation between and declarations of the parties during the negotiations at and before the time of the execution of the contract may be shown. (Code Civ. Proc., secs. 1860, 1861; *City of Atlanta* v. *Schmeltzer*, 83 Ga. 609 [10 S. E. 543]; *Keller* v. *Webb*, 125 Mass. 88 [28 Am. Rep. 209]; *Long* v. *Long*, 44 Mo. App. 141; *Sweat* v. *Shumway*, 102 Mass. 365 [3 Am. Rep. 471].)"

■ Moreover, many other parts of the record go to show, and do show, that in the instant case the plaintiff was not entitled under his contract to recover an additional dollar for each yard poured. There is evidence, as shown above, that the county surveyor made no order, oral or written. There is uncontradicted evidence that as plaintiff poured the concrete he did not at any time keep the opposite side of the roadway clear and open to public traffic. There was uncontradicted evidence that as plaintiff poured the concrete he allowed his equipment to stand and project over that portion of the roadbed which it is claimed was open to the public. The plaintiff did not, therefore, introduce a case within the purview of that portion of the contract on which he rests his claim.

The judgment is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 8, 1934.

Langdon, J., voted for a hearing.

Spence, J., *pro tem.*, did not participate.