[Civ. No. 5147.   Fourth Dist.   Sept. 30, 1955.]

JAMES B. PARNELL et al., Respondents, v.
T. A. STANFIELD, Appellant.

Brooks Crabtree and Byron F. Lindsley for Appellant.

Clarence Harden for Respondents.

GRIFFIN, Acting P. J.—It is conceded that the factual background and contentions made on this appeal are fairly set forth in a written opinion of the learned trial judge. We therefore adopt certain portions thereof and excerpts therefrom as appear from the record before us.

In 1953 defendant, appellant and cross-complainant Stanfield, a general contractor, entered into a contract with defendant La Mesa-Spring Valley School District (hereinafter referred to as the school district) to construct certain buildings known as Lake Murray Elementary School. It consisted of various distinct units. Plaintiffs, respondents and cross-defendants, the plumbing contractors, on September 2, 1953, entered into a subcontract with the general contractor to do portions of the work described in the subcontract in the following language: "all Heating, Ventilating and Plumbing, including temporary hookup and as per Edward Rohde Company proposal, dated August 13, 1953," which recites:

"Confirming our telephone conversation we quote on the above project as follows:

"We propose to furnish and install Plumbing, Heating and Ventilating for the above project, as per plans and specifications, including Addendums #1, #2 and #3 for the sum of Sixty three thousand three hundred twelve and no one-hundred dollars. ($63,312.00).

"The above price does not include the following items:

"Downspouts beyond five (5) feet from building.

"Concrete Work of any kind. . . ."

The plans and specifications prepared in behalf of the school district, and forming part of the principal contract, contemplated not only the erection and completion of the several buildings constituting units of the school but also certain features external to the buildings themselves, includ-

ing certain sewer lines, and a drainage system consisting of several units designed to carry off storm waters not only from the several buildings included in the project but also from the school grounds generally and to deposit the same in certain neighboring canyons. The contract provided for metal downspouts attached to the exteriors of the buildings themselves, continued on, reaching the ground level so as to project along the ground in a horizontal position at right angles to the walls of the buildings for a distance of 5 feet therefrom to connect with concrete pipes designed to carry the water off the school grounds as well as the water from the downspouts, and into the canyons referred to. For such water other than that from the buildings, as should be involved in draining the school grounds, certain concrete catch basins were provided for, opening into the concrete drainage pipe system and intended to serve as intakes for the same. The provisions for the drainage system included also certain concrete head walls.

Work under the subcontract was duly completed to the satisfaction of all parties except that a dispute arose between the general contractor and the subcontractor, as to whether or not the subcontract required the latter to construct the system of storm drains referred to, exclusive of the metal downspouts which the subcontractor acknowledged to be a part of his work and duly constructed, and exclusive, also, of the concrete catch basins and concrete head walls, which the general contractor conceded to be excluded from the subcontract, and which he constructed himself. The rest of the drainage system the subcontractor refused to construct, by reason of which the general contractor himself found it necessary to employ another subcontractor to complete the same at a cost of $7,500, to which is added $200 engineering work thereon performed at his own cost by the general contractor. In his payments to the subcontractor the general contractor has withheld from the subcontract price the sum of $13,781.07.

The main question to be decided in the case is whether or not the subcontract required the plaintiff subcontractor to construct the storm drains, in addition to the metal downspouts and so much of their horizontal construction as did not project more than 5 feet from the walls of the building.

The subcontractor does not dispute that the construction of the sewer system, consisting of vitrified pipe, even outside the school buildings, fell within the scope of the subcontract, and has constructed the same accordingly.

██ In determining the issue resort must be first had to the particular provisions of the contract here involved. In the general specifications the section devoted to "Plumbing" begins with the page numbered 93 LM. It opens with the provision that:

"The General Conditions shall apply to all work performed under this section, the same as if written herein."

Under the head "Scope of Work" appears the following:

"Includes all labor, permits, materials, tools, appliances and transportation that may be required to furnish and set all plumbing drainage, water supply, plumbing fixtures and gas piping, as called for by the drawings. This shall include sewer, water and fuel gas connections and service. This shall include application for any cost of fuel gas and water meter, vaults, and shall include complete sewerage disposal system as indicated. . . ."

Counsel for plaintiff subcontractor stresses the contention that in this whole section, which embraces many pages, there is no detail at all concerning any such thing as storm drainage or a storm drainage system. In the section the expression "plumbing drainage" is used, but it apparently was intended to be synonymous with "sewage drainage" and it would be a strained construction to treat it as referring to "storm drainage." Apparently this whole section on the subject of plumbing is conspicuous for its lack of any express inclusion of storm drains within its provisions. However, in Addendum 2, page 3, Item 17-c, under the heading "Plumbing Work," appears the sentence:

"Delete reference to standard cast iron soil pipe, except last sentence and substitute with service weight cast iron soil pipe.

"Add the following paragraph:

"Furnish and install service weight cast iron soil pipe for storm drains from base of downspouts and to a distance of 5'-0" outside of porch for drains four inch (4") size and under. Storm drains over four inch (4") in size shall be concrete drain pipe bell and spigot with cemented joints troweled smooth."

This appears to be a modification of page 95-LM of the general specifications, included in the section headed "Plumbing," reciting:

"Soil, waste and vent piping 6" above grade or floor may be standard weight cast iron soil pipe or standard weight galvanized steel pipe; piping below floors, slabs, walks or

terraces and to a distance of 5'-0" beyond building or less than 24" below grade shall be standard weight cast iron soil pipe. Piping beyond 5'-0" of building shall be cast-iron soil pipe or vitrified clay sewer pipe, as indicated by drawings.''

■ Counsel for the general contractor relies upon the ''General Conditions'' as constituting part of the specifications, in which is found a provision that every subcontractor shall ''be bound by the terms of the Contract Documents as applicable to his work, unless specifically noted to the contrary in the subcontract. . . .'' The provisions of the Standard Conditions (section 35-c) between the general contractor and the school district are to the effect that: ''Any work called for by the drawings and not mentioned in the specifications, or vice versa, is to be furnished as though fully set forth by both. . . .''

From an examination of the blueprint plans, there can be no doubt that the page lettered M-1 and Addenda No. 2-c under the Plumbing Plot Plan, contains a full layout of both the sewer system and the storm drains, including the position of the catch basins and head walls above referred to.

Counsel for the subcontractor directs our attention to a certain circumstance, i. e., that in the general specifications the detail of the work to be done in connection with the storm drains appears under another head than that of plumbing, namely, in the section dealing with concrete work, including particularly under Paragraph 17, LM-13, headed ''Concrete Pipe'' a specification of the size and make of the pipes required, the caulking of the same to be done, and the construction of the sumps and head walls.

The trial judge stated that the character of the specifications for the storm drain was sketchy and unsatisfactory and that in the absence of any other evidence it might appear from them that the storm drains were treated therein as part of the plumbing and accordingly the duty of installing them would rest on the subcontractor who had been engaged to do the plumbing under the main contract, but concluded that the Rohde Company letter and proposal which was made a part of this subcontract must have assigned to it some meaning, i. e., exclusion of the ''Downspouts beyond five (5) feet from the Building,'' and since there are no horizontal extensions of the metal downspouts beyond five feet from any of the buildings shown on the plans but all horizontal parts of such metal downspouts terminate according to the plans five feet from the exterior walls of the buildings, the exclusion, if taken

to refer only to metal downspouts, would refer to nothing at all provided for in the contract, and therefore it would render the letter and proposal meaningless, but if given any meaning at all, it must be taken to refer to the concrete storm drains into which the water from the metal downspouts was to be discharged, and to exclude these from the subcontract. It is the argument of defendant that an exclusion of downspouts cannot legitimately be deemed an exclusion of storm drains and that the subcontractor had no right to expect that it would be understood by the general contractor as applying to the storm drainage system; that under the law the Rohde Company was not entitled to construe in its favor language calculated to mislead the one to whom its proposal was submitted, citing *Granger* v. *New Jersey Ins. Co.*, 108 Cal.App. 290 [291 P. 698]. Evidence was introduced in behalf of the general contractor to the effect that in the practice of the trade the expression ''concrete work'' is understood as including only such work as requires the one charged with it to use forms and pour concrete, but not to include the use of ready-made concrete pipes, and that therefore, as applied to the exclusion in the instant case, it would apply only to relieve the subcontractor from constructing the catch basins and head walls, which were admittedly to be excluded, but not to exclude the furnishing and installation of the concrete pipe involved in the storm drainage system.

The trial court then concluded that the several writings, taken together, constituted the contract, and there was presented a sufficient ambiguity to justify the receipt of extrinsic evidence, as contemplated by sections 1856 and 1860 of the Code of Civil Procedure, and section 1647 of the Civil Code, in an effort to determine what was meant by the language used.

The Rohde Company letter was properly considered by the trial court as a part of the subcontract. In construing the meaning the trial court took evidence of the parties who discussed the provisions of the formal contract and the plans and specifications, before the formal acceptance of the bid of the Rohde Company. It considered the evidence of the general practice of contractors in interpreting these plans and specifications in conjunction with the Rohde letter. Plaintiffs' agent testified that before making the bid he discussed the limitations of their obligations under the general contract in reference to the storm drains and downspouts; that he went over plaintiffs' proposal, item by item, with defendant's

agent, and that although he may not have used the term "storm drains" he definitely told defendant's agent that no concrete was included; that he did not think there was any question that "he didn't say that storm drains would not be beyond five feet of the building . . ."; that in the discussion he may have referred to them as downspouts but it was fully explained to defendant, and they agreed that plaintiffs would not go beyond 5 feet of the building in the work to be performed by them and as a result they both initialed the change. Defendant's agent, on the other hand, testified that the conversation had been a very brief one, and that while he, like plaintiffs' agent, could not recall it verbatim, nothing was said in terms about any exclusion of the storm drainage system nor anything which gave him any idea that it was intended to be excluded.

One general contractor, who unsuccessfully bid on the general contract job, testified that after reading the plans and specifications he interpreted them as indicating that the storm drains were not to be installed by the plumbing subcontractor, and that the term used excluding downspouts 5 feet from the building means, in the trade, that his work stops 5 feet from the building.

The court concluded that under the writings and circumstances presented by the evidence the contract presented enough of an ambiguity to justify the receipt of the extrinsic evidence. We are in accord with the conclusion reached. (*Balfour* v. *Fresno Canal & Irr. Co.*, 109 Cal. 221, 226 [41 P. 876] ; *Raisch* v. *County of Monterey*, 140 Cal.App. 627 [35 P.2d 587] ; *Schmidt* v. *Macco Const. Co.*, 119 Cal.App.2d 717 [260 P.2d 230].)

The court fairly stated that there was nothing in the evidence to lead it to doubt that both the general contractor and the subcontractor were acting in good faith; and that all parties believed themselves to be right in the construction which they respectively placed on the contract. It then concluded that the typed letter of exclusion was drawn with the purpose of clarifying any possible belief by plaintiffs that they were obligated, by the plans and specifications, to do anything beyond 5 feet from the building in reference to the downspouts; that since defendant knew that there were no horizontal extensions of the metal downspouts beyond 5 feet from any of the buildings, reference to downspouts "beyond five feet" must have been intended to refer to the storm drains; that plaintiffs were relying on the terms of the letter, and that by defendant's acceptance of these exclusion clauses

plaintiffs were led to believe that the storm drains under discussion were excluded notwithstanding any inconsistent provisions of the main contract; and that the written and accepted exclusion clause must prevail over the inconsistent provisions of the printed form used in the bid; that the general contractor was charged with notice that the subcontractor understood the subcontract to exclude the storm drains; that accordingly defendant was in no position to claim that it included them; that it follows that the subcontractor was under no duty to install them; and that the subcontractor should prevail in this action, citing section 1651, Civil Code. (See also *Body-Steffner Co.* v. *Flotill Products, Inc.*, 63 Cal.App.2d 555 [147 P.2d 84]; and *Burns* v. *Peters*, 5 Cal.2d 619 [55 P.2d 1182].) Findings and judgment were entered accordingly in favor of plaintiff for $13,781.07. Defendant, appellant and cross-complainant was denied relief under his cross-complaint.

We conclude that while a contrary conclusion may well have been reached as to the effect of the original subcontract, after its modification by the letter of exclusion, the trial court was authorized to consider the additional evidence for the purpose of interpreting its meaning and effect and the intention of the parties.

It is a cardinal rule of law, as we held in *Tide Water Assoc. Oil Co.* v. *Curtin*, 41 Cal.App.2d 884 [107 P.2d 945], that it is the province of the trial judge to resolve doubtful language in an oil lease, and to determine the meaning and effect of a subsequent agreement ratifying it, and an appellate court cannot disturb the decision of the trial court where the instruments, considered in the light of the facts, are susceptible of the interpretation placed upon them even though another interpretation might seem equally tenable.

Judgment affirmed.

Mussell, J., and Shell, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.