fore, that she in good faith, having made a valid contract to sell this real estate, procured of her husband the transfer to Walton by deed, in which she joined, of her husband's interest in the property, for which transfer she paid her husband a substantial purchase price; that, when the deed was executed, she took it in her possession, and forwarded it to her agent, to be used in completion of her part of the contract of sale. Whether her delivery of the deed to her agent was under the circumstances a delivery in escrow, as to her, is not important. Certainly, as to her husband, when the deed executed by him came into her possession, and she had paid the agreed consideration for his interest in the premises and his conveyance thereof to the purchaser, to whom she was then obligated to give complete title, there remained to him no interest in the premises available either to him or his creditors.

It would seem that, when she completes her contract with Walton and the deed of the premises is delivered to him, so far as the transfer to Walton of her husband's interest in the premises is concerned, the title thereto would necessarily relate back to the time his deed was given.

Judgment affirmed, with costs. All concur.

---

KELLER v. HALSEY et al.

(Supreme Court, Appellate Division, First Department. March 5, 1909.)

1. BROKERS (§ 35*)—SALE OF STOCKS—CONVERSION.
   Where brokers purchased stocks on margin in the ordinary manner, according to the rules and customs of the New York Stock Exchange, their sale of the stocks for the customer's account after his failure to respond to a call for margins was not a conversion.
   [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 27; Dec. Dig. § 35.*]

2. BROKERS (§ 38*)—STOCKS—SALE—EVIDENCE.
   In an action against stockbrokers for conversion of plaintiff's stocks purchased on margin, for plaintiff's failure to respond to a call for margins, evidence *held* insufficient to sustain a finding that the brokers had agreed to carry the stock for plaintiff without calling on him for further margin in case that which he had deposited was exhausted.
   [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 33; Dec. Dig. § 38.*]

3. BROKERS (§ 38*)—STOCKS—WRONGFUL SALE—MEASURE OF DAMAGES.
   In an action against stockbrokers for an alleged wrongful sale of stocks held by them on a margin for plaintiff, the measure of damages was the difference between the price realized and the highest price reached within a reasonable time after plaintiff learned of the sale, within which he could have repurchased the stock.
   [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 36; Dec. Dig. § 38.*]

4. BROKERS (§ 38*) — STOCK TRANSACTIONS — WRONGFUL SALE — REPURCHASE—REASONABLE TIME.
   What constituted a reasonable time within which plaintiff could have repurchased stocks alleged to have been wrongfully sold by his brokers,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

because of his failure to comply with notice to deposit more margins, was a question of law.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 38.*]

5. BROKERS (§ 38*) — STOCK TRANSACTIONS — WRONGFUL SALE — REASONABLE TIME.

Defendants, who were stockbrokers, were carrying shares of stock for plaintiff on margins, and, plaintiff failing to respond to their calls for further margins, defendants sold part of the stock on October 4th, more on the 5th, and all of it on the 10th, notifying plaintiff of each sale on the day it was made. *Held*, that while the court, in an action for alleged wrongful sale, properly found that nine days was a reasonable time for plaintiff to repurchase the stock, it should have applied such rule to each sale, and erred in permitting plaintiff to recover the difference between the price realized and the highest price reached within nine days from the last sale, as to all the stock.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 36; Dec. Dig. § 38.*]

Appeal from Trial Term, New York County.

Action by William B. Keller against Charles D. Halsey and others. From a judgment for plaintiff, and from an order denying defendants' motion for a new trial, they appeal. Reversed, and new trial granted.

Argued before INGRAHAM, McLAUGHLIN, HOUGHTON, CLARKE, and SCOTT, JJ.

Everett P. Wheeler, for appellants.
Otto Horwitz, for respondent.

McLAUGHLIN, J. The complaint alleges, in substance, that on the 3d and 4th of October, 1904, the defendants, at plaintiff's request, and as his brokers, purchased 3,000 shares of the preferred stock of the United States Steel Corporation, on account of which he paid them $2,250; that he thereupon became the owner of the stock, which the defendants agreed to carry for his account and risk; that on the 4th, 5th, and 10th days of October, 1904, the defendants, without his authority, wrongfully sold and converted the same to their own use, to his damage in the sum of $112,712.50, for which judgment is demanded. He had a verdict for $26,054, and from the judgment entered thereon, and an order denying a motion for a new trial, defendants appeal.

At the trial there was no substantial dispute between the parties as to the following facts: That the usual way in which marginal business was done between brokers dealing in stocks on the New York Stock Exchange and their customers was that one wishing to purchase stocks on margin is required to advance to the broker a certain sum, varying according to the credit of the customer and the stock which he desires to purchase, but ordinarily a percentage of the par value of the shares; that the broker then advances the balance required to purchase the stock, which he holds for the account of his customer; that if the stock thereafter depreciates in value, determined by sales made upon the Stock Exchange, so that the margin advanced by the customer falls below a percentage agreed upon, then the broker notifies the customer to furnish additional margin, and if he fails to

do so within a time fixed the stock is sold on the Exchange and the proceeds credited to the account of the customer; that at the time of the transactions in question the margin usually required for the purchase of United States Steel preferred was 7 per cent.; that the plaintiff, prior to the transactions in question, had purchased other stocks on margin through the defendants as his brokers, but his account with them as to such other stocks was closed in May, 1904, when he paid them a balance of about $229 due them, having lost several thousand dollars as the result of his speculations; that between the 26th of September and the 1st of October, 1904, the defendants purchased for the plaintiff, at his request, 1,000 shares of Reading stock, for which he put up a margin of $1,000; that on the 3d of October they purchased for him 500 shares of Steel preferred; that the following day he went to the defendants' office and ordered the purchase of 2,500 additional shares of Steel preferred and paid $1,000 more as margin, and ordered the Reading stock sold, the proceeds of which netted him a profit of about $300, which he left with the defendants to the credit of his account; that later in the day, the price of Steel preferred having gone down, he was requested by the defendants to put up more margin, which he did not do, and thereupon 1,300 shares of the Steel preferred were sold, and he was informed of that fact; that the next day, October 5th, 200 shares more were sold, the prices realized being slightly above what had been paid for the first 500, but below what was paid for the 2,500 shares; that when these shares were sold the usual notices were sent to the plaintiff, and defendants also wrote him a letter, which he received on the 6th of October, urging him to furnish further margin, and stating that until he did so they would take such action as might be advisable and best for both his interest and their own protection, but with the understanding that he was to make good any loss they might sustain; that he did not advance any further margin, and on the 10th of October defendants sold the remaining 1,500 shares at a price slightly less than what had been paid for the same; that prompt notices of all the sales and purchases were given the plaintiff; and that when the balance of the stock was sold on the 10th of October a written statement was made, showing a balance of $4.77 due the defendants, which was received and retained by the plaintiff without objection for over 17 months and until about the time this action was commenced.

The appellants' claim, as set forth in their answer, is that by the agreement under which the stock in question was purchased the right was reserved to them to close the transaction when the margin was becoming exhausted in accordance with the rules and customs of the New York Stock Exchange; that the plaintiff was notified his margin was insufficient, and requested to advance a further sum, which he failed to do; that the sales complained of were made with his consent and approval; and that he made no objection to the final statement sent him, but instead ratified and confirmed the same. The answer also set up a counterclaim for the $4.77 due them on the statement rendered.

If the transaction in question was the usual and ordinary one between the broker and client, as governed by the rules of the New York

Stock Exchange, there would be no foundation for plaintiff's claim. He, however, claims that this was not such a transaction, inasmuch as the defendants, through Halsey, the senior member of the firm, agreed that they would carry the Steel stock for him without his paying any additional margin; and it is upon this alleged agreement that plaintiff seeks to sustain the judgment which he has obtained. He testified: That Halsey induced him to purchase the Reading stock, and later urged him to buy Steel preferred, of which he bought about 500 shares on October 3d. That when he went to the defendants' office on October 4th Halsey again urged him to buy Steel preferred, and that he then said:

"If I go in for more Steel, I want to go in for a long pull. I don't intend to jump in and out in the usual way. * * * But before I do anything further I want to have an understanding with you as to where I stand and what you are going to do for me."

That after some further conversations he said to Halsey:

"You know there are slumps and recessions in the market, and you know it better than I do, and I will be frank enough to say that I am not prepared to put up margin every time the market sags off a little."

To which Halsey replied:

"All right, Keller; we will carry you through."

That he then told Halsey upon that understanding the defendants might buy for him 1,500 shares more, which they did, and within a very few minutes he gave another order for 1,000 shares, which were purchased. That later in the day Halsey asked him over the telephone if he could not put up a little more margin, to which he replied that he could not, and such was not their understanding. That Halsey then suggested selling some of the stock, and he replied that he did not care to sell, to which Halsey said:

"Well, all right, Keller; we will have to sweat it out together."

I am of the opinion that the testimony of the plaintiff—and it is uncorroborated—does not show that the defendants agreed to carry the stock in question without calling upon him for further margin in case that which he had put up became exhausted, and that the finding of the jury that they did is not sustained by the evidence. It is not claimed by the plaintiff that anything was said as to the amount of stock which the defendants should carry for his account, or how long they should hold it. If his construction of the conversation to which he testified is to be adopted, then it was an agreement to extend to him practically unlimited credit. He could order what stock he pleased and compel defendants to hold it for him, however much it might decline in value. An agreement of such importance and which might be attended with enormous losses must have something more for its existence than such indefinite words as "I am not prepared to put up margin every time the market sags off a little," or "All right, Keller; we will carry you through," or "We will have to sweat it out together." Not only is the verdict not supported by, but it is against, evidence. The plaintiff's statement that he did not want "to put up margin every time the mar-

ket sags off a little" clearly indicates that he did expect to put up margin if there were a material decline; otherwise, the words "sags off a little" are meaningless. Here there was a serious decline. He was informed of it, and asked for further margin, which he refused to put up. The purchases which the defendants made cost nearly $230,000, and he had advanced towards the purchase price about $2,250, less than 1 per cent.

If, however, the foregoing conclusion is incorrect then it seems to me that the verdict is clearly against the weight of evidence. The defendants Halsey and Daily testified that the plaintiff was asked to put up additional margin on October 4th, and that he at first told them he would do so, but finally said he could not get the money until the next day, and they thereupon refused to carry all of the stock until then, but agreed with him to sell 1,500 shares and hold the remainder upon condition that he supply the necessary margin the following day, to which he assented; that he did not advance any additional margin, and they finally closed out his account, having notified him that they should do so. To corroborate their testimony as to the notices they gave, carbon copies of what purported to be letters to him were introduced. He denied the receipt of such letters, and whether or not they were received presented a question of fact. He did admit, however, that he received a letter, written on the 5th of October, in which the defendants said:

"We were, of course, very much disappointed at your not being able to arrange for margin this a. m., but will look to have you do so if at all possible to-morrow. * * * We would therefore urge you to * * * arrange matters so as to protect your present holdings and take advantage of any opportunity that may offer. In the meantime we will do what we can, and take such action as we may deem advisable and best for both your interest and our own protection, but with the understanding that the matter is left entirely to us, and that you are to make good any debt or loss that may result."

He apparently acquiesced in this statement, so far as permitting defendants to manage the account as they saw fit, inasmuch as he did not comply with the request to put up any further margin, nor, so far as appears, object to what they proposed to do. This is very significant, when taken in connection with what occurred when the stock had been sold and a final statement of the account rendered to him. He testified that he then telephoned Daily, one of the defendants, that he had received the statement, and said:

"I see I am indebted to you, according to your statement, $4.77. I suppose that you will be sending a man around to collect it."

He then hung up the receiver without giving Daily a chance to reply. Daily denied that such a conversation had taken place. But, assuming that it did, it does not aid the plaintiff. On the contrary, it tends to corroborate the testimony offered by the defendants to the effect that he had been previously informed that if he did not put up margin the stock would be sold, and especially so when the fact is taken into consideration that he retained the statement for over 17 months without making any further protest or claim that the defendants had no right to sell the stock.

The defendants, under the facts presented, were justified in selling the stock, and plaintiff had sufficient notice. He had been the editor of a trade journal for some 26 years, had previously dealt in stocks on margin through the defendants, was informed of every purchase and each notice sent contained this statement:

"It is hereby understood and agreed that on all marginal business the right is reserved to close transactions when margins are becoming exhausted without further notice, and to settle contracts in accordance with the rules and customs of Exchange where order is executed."

He was familiar with the custom, which was that the broker should notify the customer to advance more margins, and, if he failed to do so, then sell the stock on the New York Stock Exchange. That was done in the present case. It seems to me, therefore, that the weight of evidence is that the plaintiff agreed to advance more margin, that he failed to do so, that the defendants sold the stock in accordance with the agreement upon which it was purchased, and that they were, therefore, not liable for conversion.

The court charged the jury that if the stock were wrongfully sold the measure of damage was the difference between the price realized and the highest price reached within a reasonable time, after plaintiff had learned of the conversion, within which he might go into the market and repurchase it, fixing such reasonable time as nine days from the last sale; that is, October 19, 1904. The rule as to the measure of damage adopted was correct. Wright v. Bank of the Metropolis, 110 N. Y. 237, 18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356; and what constituted a reasonable time was, upon the facts presented, a question of law. Burhorn v. Lockwood, 71 App. Div. 301, 75 N. Y. Supp. 828. But the date adopted as to some of the sales was an unreasonable one. The fact is not disputed that the plaintiff was immediately informed of all the sales, and what would be a reasonable time to repurchase the stock sold on the 10th would, obviously, be more than a reasonable time, nothing appearing to the contrary, to repurchase the stock which was sold on the 4th and 5th. No reason is suggested why the plaintiff should have any more time to repurchase in the one case than in the other. It seems to me, therefore, that the court erred in applying a different limitation to the sales by allowing a recovery on the basis of the highest price up to a certain date for all of the sales.

For the foregoing reasons, I think the judgment and order appealed from should be reversed, and a new trial granted, with costs to appellants to abide event. All concur.