MICHAEL PHILLIPS, Plaintiff, *v.* BANK OF ATHENS TRUST COMPANY, Defendant.

Supreme Court, Special Term, New York County, March 31, 1952.

*Frederic E. Emmerich* for plaintiff.

*A. Chalmers Mole* for defendant.

ISIDOR WASSERVOGEL, Special Referee. This is an action for damages for breach of a contract of pledge and for conversion, wherein plaintiff contends that the defendant wrongfully sold 1,000 shares of common stock of Willys-Overland Motors, Inc., which were held by defendant as collateral for loans made by it to the plaintiff.

The facts involved herein are undisputed and were incorporated by counsel for the respective parties in a " stipulation of facts." This stipulation was submitted by counsel together with the pleadings with the intent that they be accorded the same force and effect as documentary evidence and testimony of witnesses, as if such evidence and testimony had been adduced upon the trial of the action. The relevant facts are substantially as follows:

Between June 9, 1948, and May 11, 1950, the defendant made four separate loans to plaintiff, who executed and delivered to defendant four demand notes. The first note contains the following provision with respect to defendant's right of sale: " The undersigned hereby agrees to deposit with the Trust Company such additional collateral security as may from time to time be demanded * * *. Upon the non-payment of this note upon demand or upon non-payment of interest of this or upon the non-performance of any of the agreements in this note by the undersigned, the whole or any part of any or all of the aforesaid obligations or liabilities of the undersigned shall mature at the election of the Trust Company upon demand or by presentation thereof for payment, and in any of such events the Trust Company shall have the right to sell * * * the whole or any part of the property hereinabove specifically described * * * at any time * * * without demand, advertisement or notice, which are hereby waived ".

Each of the subsequent three notes provides that: " The undersigned — (plaintiff) — hereby agrees that, if at any time the Security for any or all of the Liabilities shall be unsatisfactory to the Trust Company, upon the demand of the Trust Company at any time or from time to time, the undersigned will furnish promptly such further Security or make such payment on account as will be satisfactory to the Trust Company, and

if the undersigned fails so to furnish such security or to make such payments * * * any or all of the Liabilities shall become and be due and payable forthwith * * *. The Trust Company, upon default in payment, furnishing Security or otherwise, may sell or cause to be sold * * * all or any of the Security, * * * without demand of performance or notice of intention to sell or of the time and place of sale ''.

On Sunday, June 25, 1950, the Korean conflict was commenced by the invading forces. As a result, security market valuations dropped sharply. On June 27, 1950, the balance due defendant from plaintiff on the four notes was $7,739.45. At this time, the collateral security pledged by plaintiff, including the 1,000 shares of Willys-Overland, Inc., common stock, amounted to approximately $10,558.

At 10:25 of the morning of June 27, 1950, the defendant filed a telegram with Western Union Telegraph Company addressed to plaintiff at his home at 15 West 107th Street, New York City, advising him that it required an additional $1,500 margin on his " security loan before noon ". The telegram was misdirected by the telegraph company and was not delivered to plaintiff's residence until about 2:30 P. M. in the afternoon. Plaintiff actually saw the wire for the first time at about 5:00 P. M. However, prior to the delivery of the telegram at plaintiff's residence, at approximately 1:30 P. M. the defendant placed an order for sale of plaintiff's 1,000 shares of common stock of Willys-Overland, Inc. Nine hundred shares of said stock were sold at 5⅜ per share and the remaining one hundred shares at 5½ per share. The net proceeds of the sale (after deductions of $134.54 for commissions and taxes), amounting to $5,252.92, were applied by the defendant in reduction of plaintiff's loans.

During the forenoon of June 28, 1950, plaintiff advised defendant's security department that he would bring to it the additional amount of money previously requested by defendant. On being informed that his stock had been sold the previous day, plaintiff objected to the sale as unauthorized. Thereafter, the instant action was commenced.

It is plaintiff's contention that under the provisions of the notes, the defendant, as pledgee, was obliged to give him actual notice to deposit additional security and a reasonable opportunity to comply therewith before it could lawfully sell the collateral it held. Defendant contends, however, that no notice whatsoever to plaintiff was required prior to the sale of the collateral securities.

The general rule as between pledgor and pledgee in regard to giving notice of the time and place of selling the pledged property is subject to such other or different agreement relating thereto as may be made by them. They may agree upon a prescribed notice or dispense with any notice. Such agreement may be express or it may be found in the surrounding circumstances or in the course of dealing between the parties (*Smith* v. *Craig,* 211 N. Y. 456, 461). In any event in the instant action it is necessary only to look to the language of the notes in order to determine the agreement between plaintiff pledgor and the defendant pledgee.

No legal precedent has been found by the court nor has counsel for either party brought to the court's attention a case wherein the phraseology of the demand notes in issue has been litigated or interpreted by the courts of this State. Both litigants concede that the terms of the notes themselves govern the rights and liabilities of the parties.' These notes constitute the contract between them and define their duties and/or obligations. The notes, however, also create a pledge agreement, whereby plaintiff retained a legal right to the restoration of the stock pledged as security upon payment of the debt. The provisions of the notes, as heretofore set forth, gave the defendant the right to sell such stock without notice to plaintiff, only upon either of two conditions, namely, that (1) plaintiff defaulted in payment of the notes *upon demand therefor,* or (2) plaintiff, *upon demand,* failed to furnish additional security. In the event of the occurrence of either contingency, defendant pledgee could then legally dispose of the stock without further notice to the plaintiff pledgor. Nevertheless, it is to be noted that a *demand* for payment or security and subsequent default by plaintiff to meet such demand are conditions precedent to defendant's legal authority to dispose of the stock by sale.

It has been well established that a pledgee must give *actual* notice of a demand for additional margin or security to the pledgor (*Strong* v. *National Mechanics Banking Assn.,* 45 N. Y. 718, 720; *Gillett* v. *Whiting,* 120 N. Y. 402, 403). It necessarily follows that the mere transmission of the demand and notice by mail or telegraph is insufficient if the pledgor never receives it. Reasonable efforts to communicate with the pledgor will not, in the opinion of the court, dispense with the necessity of actual notice.

In the instant action, the telegraphic demand for additional security of $1,500 was not delivered to plaintiff's residence until 2:30 P. M. As heretofore stated, an hour previously thereto,

the defendant had sold the 1,000 shares of stock, which brought a net of $5,252.92 as against a demand for $1,500 margin. Thus, even if plaintiff had received the telegraphic demand when it was delivered, he would, in any event, have been too late to prevent the sale of his stock. Under these circumstances, therefore, I have reached the conclusion that the defendant, in failing to give plaintiff *actual* notice of demand for additional security, had no legal right to sell plaintiff's pledged stock on June 27, 1950.

In view of this determination, it is unnecessary for the court to consider what constitutes "reasonable opportunity" to furnish additional collateral before the sale of pledged securities and whether defendant did furnish or was obliged to furnish plaintiff with such opportunity.

The rule is well settled that a person whose stocks have been converted is entitled to a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof. He may use as a basis for his claim of damages resulting from the conversion the highest prices which prevailed during such reasonable period (*Mayer* v. *Monzo,* 221 N. Y. 442, 446; *Hurt* v. *Miller,* 120 App. Div. 833, 837, affd. 190 N. Y. 553; *Baker* v. *Drake,* 53 N. Y. 211).

The question of what constitutes a reasonable time after knowledge or notice of the wrongful sale for the purpose of measuring damages depends upon the circumstances of each particular case. No fixed period is prescribed by law nor is there any rule of thumb by which such period can be ascertained. The time may be more substantially limited if the pledgor definitely takes the position that he will or will not repurchase the converted securities. If he makes his decision at once or at a definite time, the period during which he may measure his damages will then terminate. If a definite decision is not made, inferences may be drawn from surrounding circumstances as to the period of time which is reasonable for the ascertainment of damages.

In the case at bar, the stipulation of facts, which sets forth the daily valuation of the stock in issue from June 26, 1950, to August 25, 1950, clearly shows that the value of the pledged securities began to rise steadily from the day following their sale. Plaintiff could have recouped any loss almost immediately. It is apparent, however, that his delay and decision to do nothing was occasioned by his determination to speculate on the continued rise of the market. Such speculation at the expense of the defendant cannot be condoned by the court (*Newton* v. *Wade,*

239 App. Div. 742, affd. 264 N. Y. 632; *Rosenbaum* v. *Steibel,* 137 App. Div. 912).

In view of this I hold that plaintiff's damages are fixed by the highest market price between June 28, 1950, when he notified defendant of his objection to the sale and one week thereafter, July 5, 1950. The highest price was 6¼ per share on June 29 and July 5, 1950.

Accordingly, the difference between the price at which the 1,000 shares of common stock of Willys-Overland Motors, Inc., were sold on June 27, 1950 ($5,252.92) and the highest market price at which the shares sold ($6,250) amounts to $997.08.

Judgment is rendered for the plaintiff for $997.08, upon which interest may be computed from June 27, 1950.

The above constitutes the decision of the court as required by section 440 of the Civil Practice Act.