**BACHE & CO., INCORPORATED,**
**Plaintiff,**

**v.**

**INTERNATIONAL CONTROLS CORPO-**
**RATION, Defendant.**

**No. 68 Civ. 4133.**

United States District Court,
S. D. New York.

Feb. 4, 1972.

Sullivan & Cromwell, New York City, for plaintiff; Howard T. Milman, Joel M. Miller, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant; David R. Hyde, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW ON QUESTION OF DAMAGES.

LEVET, District Judge.

This is an action brought by plaintiff Bache & Co., Incorporated ("Bache") against defendant International Controls Corporation ("ICC") for damages resulting from a breach of a tender offer to purchase securities (common stock and debentures convertible into common stock) of Electronic Specialties Co. ("ELS").

The issue of liability has already been tried to the court without a jury. As a result of that trial, this court granted plaintiff judgment that defendant is liable to plaintiff for 30,649 shares of common stock and 42 $1,000 debentures of ELS. The determination as to damages follows.

Two main questions are presented. First, whether New York or New Jersey law governs. Second, what is the amount of damages under that law.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. QUESTION OF NEW YORK OR NEW JERSEY LAW

1. Plaintiff is a corporation organized and existing under the laws of the state of Delaware, engaged in a general securities business, a member of the New York Stock Exchange and other national securities exchanges and has its principal office at 100 Gold Street, New York, New York.

2. Defendant is a corporation of the State of Florida having its principal place of business at 88 Clinton Road, Fairfield, New Jersey.

3. The significant and relevant contacts in the tender offer took place in New York as hereinafter appears:

(A) The tender offer which defendant ICC made in the fall of 1968 for the securities of ELS was received by plaintiff Bache by mail in New York. (Pl. Ex. 1.)

(B) Bache accepted this tender offer in New York by delivering the letters of transmittal to Chemical Bank in New York which thus created binding contracts between August 30 and September 12, 1968. (See opinion on liability, Bache & Co., Inc. v. International Controls Corp., 324 F.Supp. 998, 1005 (1971).)

(C) Subsequently, Bache was requested to deliver the securities to Chemical Bank in New York and payment was to be received in New York. Bache did this by delivering the certificates representing the tendered securities to Chemical Bank, the forwarding agent named in the letter of transmittal, in New York on October 2, 1968. (Tr. 71–73, 129–130; Pl.Ex. 17, Pl.Ex. 22, Pl.Ex. 23.)

(D) The dealer-manager appointed by ICC to manage the tender office (Orvis Brothers), the broker hired by ICC to assist in solicitation (D. F. King & Co.), and the forwarding agent (Chemical Bank) were all located in New York. (Pl.Ex. 1.)

(E) ICC's depositary banks were located in California and New Jersey, but ICC specifically provided a forwarding agent (Chemical Bank) in New York for Bache to deal with. (Tr. 103–106; Pl.Ex. 1.) Bache had no direct dealings with either of the out-of-state banks.

Hence, I find that the significant contacts took place in New York.

### II. QUESTION OF DAMAGES

The number of ELS securities involved in this case is not at issue here as both parties are in agreement. (See Pl.Ex. C, "Computation of Damages Under the Theory Asserted by Plaintiff," November 8, 1971 (hereinafter referred to as Pl.Ex. C, Nov. 8, 1971).) It is rather the theory of damages that divides the parties. I find it necessary, nevertheless, to make findings as to the

specific number of shares and debentures held or resold by Bache for itself or for its customers so as to facilitate the application of the theories of law (see Discussion, infra).

4. Subsequent to defendant's tender offer, I find that an exchange agreement was consummated whereby each share of common stock of ELS was exchanged for .7 shares of defendant's common stock and 1.5 of its class A warrants. There has been no exchange or conversion of the ELS debentures. (Stipulation of Facts with Respect to Damages, October 7, 1971, at 1.)

5. This court has already decided that Bache is the real party in interest and is the proper party to bring this action on behalf of its customers. (See opinion on liability, Bache & Co., Inc. v. International Controls Corp., 324 F. Supp. 998, 1005 (1971).)

6. On the date of the breach of the tender offer, October 2, 1968, the New York Stock Exchange was closed. On October 3, 1968 the closing market price on the New York Stock Exchange for the ELS common stock was $30.50 and for the ELS convertible debentures was $1,050. (Stipulation of Facts with Respect to Damages, October 7, 1971, Ex. F.)

7. Defendant is liable to plaintiff for 30,649 shares of ELS common stock, 21,301 of which are being held for Bache's customers and 9,348 of which for Bache itself. (Pl.Ex. C, Nov. 8, 1971, at 1.)

8. Defendant is also liable to plaintiff for 42 $1,000 ELS convertible debentures all of which are being held for Bache's customers. (Pl.Ex. C, Nov. 8, 1971, at 2.)

9. Of the 21,301 shares held for Bache's customers, 4,732 are unsold, 15,869 have been resold, 403 have been partially resold and claims for 297 have been withdrawn because sufficient information is not available to determine damages. (Pl.Ex. C, Nov. 8, 1971, at 1.)

10. Of the 9,348 shares being held for Bache, 2,148 are unsold, 7,100 have been resold, and claims for 100 have been withdrawn because sufficient information is not available to determine damages. (Pl.Ex. C, Nov. 8, 1971, at 2.)

11. In all, claims for 397 shares have been withdrawn because of insufficient information to determine damages. Consequently, defendant is liable for only 30,252 shares.

12. Of the 42 $1,000 debentures being held for Bache's customers, 28 are unsold and 14 have been resold. (Pl. Ex. C, Nov. 8, 1971, at 2.)

13. In ICC's tender offer ICC agreed to pay "to any securities dealer whose name appears on the letter of transmittal a commission of $.70 per share Common . . . on all Common stock . . . solicitated by such dealer and purchased by the Company." (Pl.Ex. 1; see opinion on liability, Bache & Co., Inc. v. International Controls Corp., 324 F.Supp. 998, 999 (1971).)

In ICC's tender offer ICC also agreed to pay "to any securities dealer whose name appears on the letter of transmittal a commission of $22.19 per $1,000 debenture on all . . . convertible debentures solicited by such dealer and purchased by the Company." (Pl.Ex. 1; see opinion on liability, Bache & Co., Inc. v. International Controls Corp., 324 F.Supp. 998, 999 (1971).)

Hence, I find that plaintiff is entitled to recover the full amount of the commissions as specified in the tender offer.

14. I find that plaintiff is entitled to interest at the legal rate on the amount of damages awarded.

15. $236.30 has been received by plaintiff as a result of exchanges in the common stock and will be deducted from plaintiff's final award. (Pl.Ex. C, Nov. 8, 1971, at 2.)

16. I find that plaintiff is entitled to costs as taxed.

17. The ELS securities presently being held by Bache for itself and for its customers and the dates on which the securities were resold are listed in Exhibits A and B of the Stipulation of Facts with Respect to Damages of Oc-

tober 7, 1971. Those exhibits will be filed with this opinion.

I find that plaintiff is entitled to recover the following amount of damages:

(A) Unsold Securities (see Discussion, III(A), infra)

   (1) 4,732 shares:

      $39 (tender price) x 4,732        = $184,548.00

   (2) 2,148 shares:

      $39 (tender price) x 2,148 shares  = $ 83,772.00

   (3) 28 $1,000 debentures:

      $1,236 (tender price) x 28     = $ 34,608.00

(B) Resold Securities (see Discussion, III(B), infra)

   (1) 15,869 shares:

      (a) 1,283 shares: $39 (tender price) minus resale price for each share resold by November 1, 1968  = $ 10,119.37 [1]

      (b) 14,586 shares: $39 (tender price) minus $30.50 (market price at time and place of tender) for each share resold after November 1, 1968: 14,586 x $8.50  = $123,981.00

   (2) 7,100 shares:

      $39 (tender price) minus $30.50 (market price at time and place of tender) for each share: 7,100 x $8.50  = $ 60,350.00

   (3) 14 $1,000 debentures:

      (a) 1 $1,000 debenture: $1,236 (tender price) minus resale price for the debenture resold by November 1, 1968: $1,236 minus $1,062.50  = $ 173.50

      (b) 13 $1,000 debentures: $1,236 (tender price) minus $1,050 (market price at time and place of tender) for each debenture resold after November 1, 1968: $186 x 13  = $ 2,418.00

[1]

| ACCOUNT NO. | NO. OF SHARES | DATE OF RESALE | PRICE PER SHARE | TOTAL RESALE PRICE (without commissions deducted) | TENDER PRICE MINUS TOTAL RESALE PRICE |
|---|---|---|---|---|---|
| Acct. No. 9 | 3 shares | October 28, 1968 | $ 30.875 | $ 92.63 | $ 24.37 |
| Acct. No. 37 | 100 shares | October 28, 1968 | $ 30.875 | $3,087.50 | $ 812.50 |
| Acct. No. 75 | 100 shares | October 21, 1968 | $ 29.00 | $2,900.00 | $ 1,000.00 |
| Acct. No. 90 | 80 shares | October 28, 1968 | $ 30.625 | $2,450.00 | $ 670.00 |
| Acct. No. 91 | 100 shares | October 31, 1968 | $ 30.125 | $3,012.50 | $ 887.50 |
| Acct. No. 92 | 200 shares | October 25, 1968 | $ 32.625 | $6,525.00 | $ 1,275.00 |
| | 200 shares | | $ 32.50 | $6,500.00 | $ 1,300.00 |
| | 400 shares | | | | |
| Acct. No. 106 | 100 shares | October 28, 1968 | $ 30.875 | $3,087.50 | $ 812.50 |
| | 300 shares | | $ 30.625 | $9,187.50 | $ 2,512.50 |
| | 400 shares | | | | |
| Acct. No. 155 | 100 shares | October 28, 1968 | $ 30.75 | $3,075.00 | $ 825.00 |
| | | | | TOTAL.....................$10,119.37 | |

(C) <u>Partially Resold Shares</u> (see Discussion, III(B), infra)

    (1) <u>403 shares</u>:

Three Bache customers converted their 403 ELS shares into 282 ICC common stock and 604 ICC class A warrants. 210 ICC common stock and 177 ICC class A warrants (equivalent of 300 ELS shares) were resold after November 1, 1968 and 72 ICC common stock and 427 ICC class A warrants (equivalent of 103 ELS shares) are unsold.

        (a) Equivalent of 103 unsold ELS shares $39 (tender price) for each unsold ELS share: $39 x 103     = $ 4,017.00

        (b) Equivalent of 300 resold ELS shares $39 (tender price) minus $30.50 (market price at time and place of tender) for each ELS share resold after November 1, 1968: $8.50 x 300     = $ 2,550.00

(D) <u>Commissions</u> (see Discussion, III(C), infra)

    (1) <u>30,649 shares</u>:

        $.70 x 30,649 shares     = $ 21,454.30

    (2) <u>42 $1,000 debentures</u>:

        $22.19 x 42     = $ 931.98

(E) <u>Money Already Received by Plaintiff</u>

    $236.30 (to be deducted)     $ 236.30

    TOTAL DAMAGES (without Interest or Costs) = $528,686.85

---

18. Plaintiff is entitled to interest on the net amount found to be due as specified in Finding 17. The interest shall commence on the date of breach of the tender offer, i. e., October 2, 1968, and shall continue until the date on which judgment is to be entered. During the period from October 2, 1968 to February 15, 1969, the interest is to be computed at the rate of 7¼% per annum. From February 16, 1969 to the date on which judgment is entered, the interest is to be computed at the rate of 7½% per annum.

## DISCUSSION

### I. WHAT LAW APPLIES: NEW YORK OR NEW JERSEY

In a contract, the parties, subject to certain limitations, have the power to choose the law of the state which will govern their contractual rights and duties by means of including an explicit provision in their agreement directed to that issue. Absent a clear indication of what law is to govern, the applicable law will be the local law of the state which, with respect to the particular issue, has the most significant relationship to the transaction and the parties. See Restatement (Second) of Conflict of Laws §§ 186–188 (1969).

It is a fundamental principle that "a contract is governed by the law with a view to which it was made." Pritchard v. Norton, 106 U.S. 124, 136, 1 S.Ct. 102, 112, 27 L.Ed. 104 (1882). Section 1–105(1) of the Uniform Commercial Code, which is adopted in both New York and New Jersey, likewise gives the parties power to choose the applicable law. In this case we do not have such a situation. There was neither an explicit provision in the tender offer nor a clear indication by the parties as to what law would govern.

Furthermore, defendant's contention that the parties intended that the contract would *not* be governed by New York law is unsubstantiated. ICC al-

leges that the parties expected the sale to be consummated outside New York because its depositary was in New Jersey. This court already has ruled in determining liability that the tender offer became binding when the plaintiff delivered the letters of transmittal to Chemical Bank in New York. The sale became complete in New York, not in New Jersey. Also, defendant ICC had another depositary in California, and Bache did not know whether the certificates would be delivered to California or New Jersey. Moreover, California has exactly the same commercial code provision, California Commercial Code § 8107(2), as New York. Thus, application of the California law would produce the same result that the plaintiff urges.

■ There was no explicit provision, no clear intention, and no demanding expectations of the parties as to the law that would apply. Therefore, one must look to the "center of gravity" or the "grouping of contacts" theory of conflict of laws. Under this theory, the courts, instead of regarding as conclusive the parties' intention or the place of making or performance of the agreement, emphasize rather the law of the place which has the most significant contacts with the matter in dispute. Auten v. Auten, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954). This approach "gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation.' " Id. at 161, 124 N.E.2d at 102.

■ In this case the contacts are overwhelmingly in New York as stated in the Findings of Fact (see Finding 3). The tender offer originated in New York, was accepted in New York by the plaintiff, was delivered in New York to the forwarding agent, was rejected in New York, and was held to have become binding in New York. Even most of the important institutions involved in the transactions were located in New York.

Finally, it is relevant to consider which jurisdiction has the greatest interest in having its law applied. Here, New York has the paramount interest.

Section 8–107(2) of the New York Uniform Commercial Code is designed to discourage wrongful breaches of contracts to purchase securities and to foster New York's position as the leader in securities transactions. Application of the New York law is intended to further a legitimate New York policy. This reasoning was affirmed in Intercontinental Planning Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E. 2d 576 (1969), a case which applied the New York Statute of Frauds prohibiting an oral agreement to pay a broker a fee on the sale of business rather than applying New Jersey law which would have permitted such an oral agreement.

New York is concerned in seeing its statute applied in order to encourage sellers of securities to transact business in New York with the assurance that they are afforded added protection against a defaulting buyer. Application of the New Jersey statute, on the other hand, would provide more lenient sanctions and less security for buyers of securities. If New Jersey law were applied, New York's legitimate interest would be frustrated.

No choice of law was made by the parties. Therefore, the significant contacts and the legitimate state interest must control. Here, the vast majority of the significant contacts were in New York. The interest of the state of New York demands that its law be applied.

## II. MEASURE OF DAMAGES

Since New York law applies, damages must be assessed under the New York Uniform Commercial Code. At the outset it is important to note that the general policy of the New York Uniform Commercial Code ("UCC") is as follows:

"§ 1–106 Remedies To Be Liberally Administered

"(1) The remedies provided by this Act shall be liberally administered to

the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ." (New York UCC.)

### (A) *Unsold Securities*

#### (1) *Section 8–107*

The New York UCC gives a seller of securities the right to recover the agreed price of the securities as an "alternative" to any other remedy. The controlling section is § 8–107(2) which reads in pertinent part:

"Where, pursuant to a contract to sell or a sale, a security has been delivered or tendered to the purchaser, and the purchaser wrongfully fails to pay for the security according to the terms of the contract or the sale, the seller may as an alternative to any other remedy recover the agreed price of the security . . . ."

The commentary on this section acknowledges that this is a rule peculiar to New York, a rule relieving the seller of securities tendered or delivered of any duty to mitigate damages by resale in the market prior to suing for the purchase price. There is not even the need for evidence that there is no available market, or that efforts at resale would be unduly burdensome. Practice Commentary, New York Uniform Commercial Code, § 8–107, at 177 (McKinney 1964). Thus, a seller of securities is given the alternative of holding the rejected securities and recovering the tender price.

■ In this case, Bache, under § 8–107(2), can recover the tender price for the unsold stocks and debentures held by Bache for itself and its customers. That means that Bache can recover $39 for each unsold stock and $1,236 for each unsold debenture.

### (B) *Resold Securities*

#### (1) *Section 2–706*

Section 8–107(2) of the New York UCC gives only "alternative" rights as to unsold securities. The proper measure of damages for the resold securities is set forth in Article 2.

■ Although Article 2 defines "goods" as excluding investment securities (New York UCC, § 2–105(1)), the New York courts, nevertheless, have held that Article 2 applies to the sale of securities. Silverman v. Alcoa Plaza Associates, 37 A.D.2d 166, 323 N.Y.S.2d 39 (1st Dep't July 1, 1971); Hunt Foods and Industries, Inc. v. Doliner, 26 A.D.2d 41, 270 N.Y.S.2d 937 (1st Dep't 1966) (applying § 2–202 of the New York UCC to the sale of securities); Official Comment, New York Uniform Commercial Code, at 96–97 (McKinney 1964). The New York courts in determining to apply Article 2 to the sale of securities as well as goods are following the long-established rule which applied the former Sales of Goods Act (New York Personal Property Law, Article 5, which was replaced by Article 2 of the New York UCC) to the sale of securities. Agar v. Orda, 264 N.Y. 248, 190 N.E. 479 (1934). See also Division of Triple T Service, Inc. v. Mobile Oil Corp., 60 Misc.2d 720, 304 N.Y.S.2d 191 (Sup.Ct.Westchester Co. 1969), aff'd, 34 A.D.2d 618, 311 N.Y.S.2d 961 (2d Dep't 1970).

The rights available to a seller are first generally described in the New York UCC § 2–703, which provides in relevant part:

"Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected . . . the aggrieved seller may

\*    \*    \*    \*    \*    \*

"(d) resell and recover damages as hereafter provided (Section 2–706);

"(e) recover damages for non-acceptance (Section 2–708) or in a proper case the price (Section 2–709); . . . ."

UCC § 2–706, the section referred to by UCC 2–703(d), gives the seller the right to resell and hold the purchase for

the difference between the tender price and the net resale price, together with incidental damages, including the cost of the sale. In pertinent part, that section reads:

"(1) Under the conditions stated in Section 2–703 on seller's remedies, *the seller may resell the goods concerned* or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner *the seller may recover the difference between the resale price and the contract price* together with any incidental damages allowed under the provisions of this Article (Section 2–710),[2] but less expenses saved in consequence of the buyer's breach." (Emphasis added.)

Defendant, however, contends that subsections (2)–(4) of § 2–706 deny plaintiff recovery under that section. They read as follows:

"(2) Except as otherwise provided in subsection (3) or unless otherwise agreed, resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, *time,* place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

"(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

"(4) Where the resale is at public sale

"(a) only identified goods can be sold except where there is a recognized

market for a public sale of futures in goods of the kind; and

"(b) it must be made at a usual place or market for public sale if one is reasonably available and except in the case of goods which are perishable or threaten to decline in value speedily *the seller must give the buyer reasonable notice of the time and place of the resale*; and

"(c) if the goods are not to be within the view of those attending the sale the notification of sale must state the place where the goods are located and provide for their reasonable inspection by prospective bidders; and

"(d) the seller may buy." (Emphasis added.)

Defendant maintains that the sale of securities by plaintiff and its customers from one month to more than two years after ICC's refusal to accept tender of ELS securities is patently unreasonable and does not comply with the mandate of § 2–706(2) that the manner, *time,* place and terms of the sale be commercially reasonable. Defendant also alleges that plaintiff failed to notify ICC of its intention to resell the securities or to give ICC notice of the time and place of the resale.

This court agrees with defendant that the length of time beyond one month was not commercially reasonable, but disagrees with the claim that notification was not adequate under the statute.

■ The term "commercially reasonable" as used in § 2–706 of the New York UCC is not specifically defined. However, the official comments of the framers of the Code and the case law development of the law of damages with respect to breach of contracts for the purchase of securities make it relatively clear that "commercially reasonable" requires that the resale occur as soon as practicable following notice of the buyer's refusal to accept tender of the securities.

2. UCC 2–710 also entitled the seller to recover as incidental damages "expenses or commissions incurred . . . in connection with . . . the resale of the goods."

The official comments to the New York UCC shed some light on the meaning of "commercial reasonable." Comment 4 says that § 2–706(2) "frees the remedy of resale from legalistic restrictions and enables the seller to resell in accordance with reasonably commercial practices so as to realize as high a price as possible in the circumstances." Comment 5 interprets § 2–706(2) as merely clarifying "the common law rule that the time for resale is a reasonable time after the buyer's breach . . . What is such a reasonable time depends upon the nature of the goods, the condition of the market and the other circumstances of the case; its length cannot be measured by any legal yardstick or divided into degrees."

█ The objective of § 2–706(2) in encouraging the seller to obtain the best possible price by selling within a reasonable time after the breach without undue risk or expense is in accord with the basic principles of the law of damages that a plaintiff must minimize his losses. See, e. g., 11 Williston on Contracts, § 1353 (3d ed. 1968); Oleck, Damages to Person and Property, §§ 101, 105 (1961); McCormack on Damages, §§ 33, 127 (1935); Restatement of Contracts § 336 (1932).

There also have been a number of court decisions with respect to the reasonableness of the time period between the date of breach and the date of resale. Generally the courts have required the seller to resell the goods as near to the time of breach as reasonably possible when there is a ready market and a fluctuating price for the goods, particularly in cases of a declining market. See Waumbek Manufacturing Co., Inc. v. Alfandri, 196 App. Div. 64, 187 N.Y.S. 439 (1st Dep't 1921); Guy v. United States, 25 Ct.Cl. 61 (1889), for two early pre-code cases that talked about the reasonable time of the sale of goods.

More specifically, the application of the commercially reasonable time test to the sale of securities in a fluctuating market grew up in the New York securi-ty conversion cases. In these cases the measure of damages for any illegal sale of fluctuating securities is the difference between the amount credited to the plaintiff as a result of the sale and the highest market value within a reasonable time after notice of the conversion. In a leading New York case, Jones v. National Chautauqua Country Bank, 272 App.Div. 521, 74 N.Y.S.2d 498 (4th Dep't 1947), the injured party, while given a reasonable time within which to repurchase the securities wrongfully sold, had to use due diligence to keep his loss down. If within a reasonable time after knowing of the conversion he could have replaced the stock for the same price or at a price less than that which it was sold, there would be no actionable loss. See German v. Snedeker, 257 App. Div. 596, 13 N.Y.S.2d 237 (1st Dep't), aff'd, 281 N.Y. 832, 24 N.E.2d 492 (1939); Baker v. Drake, 53 N.Y. 211, 217 (1873); Fioretti v. Miller, 15 Misc. 2d 709, 712, 183 N.Y.S.2d 772, 775 (1959); Gerdes v. Reynolds, Sup., 30 N. Y.S.2d 755, 762 (1941). A reasonable time has been interpreted by some New York courts to be: Mayer v. Monzo, 221 N.Y. 442, 446–447, 117 N.E. 948 (1917) (15, 30 or 60 days); Hall v. Bache, 235 App.Div. 256, 256 N.Y.S. 693 (1st Dep't 1932) (12 days); Keller v. Halsey, 130 App.Div. 598, 115 N.Y.S. 564 (1st Dep't 1909) (9 days); Gelb v. Zimet Bros., 34 Misc.2d 401, 228 N.Y.S.2d 111 (1962) (24 days); Phillips v. Bank of Athens Trust Co., 202 Misc. 698, 119 N.Y.S.2d 47 (1952) (7 days).

In Jones, supra, the court said:

"The complainant must be vigilant to hold down or reduce his loss. 'He must not by inattention, want of care, or inexcusable negligence permit his damage to grow, and then charge it all to the other party. The law gives him all the redress he should have by indemnifying him for the damage which he necessarily sustains' . . . ." Jones v. National Chautauqua Country Bank, supra, 272 App.Div. at 529, 74 N.Y.S.2d at 505.

This so-called New York rule was recently applied in Reynolds v. Texas Gulf Sulphur Co., 309 F.Supp. 548, 563 (D. Utah 1970), aff'd sub nom., Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971). In that case the court found a 9 day period to be the maximum reasonable time for resale of the stocks.

After considering the official comments to the New York UCC, the authorities in the area, and the case law in the security conversion cases, there is still no clear-cut or easily identifiable rule as to what constitutes a commercially reasonable time. One can only say that the resale should be made as soon as practicable after the breach of the tender offer and the seller should make every reasonable effort to minimize his loss. In the present action, considering the circumstances of the breach, the mandate that remedies be administered liberally, the number of shares involved, and the distribution around the country of the owners of those shares, a thirty-day period from the day of the breach, October 2, 1968, would be a commercially reasonable time to resell the securities. Therefore, any securities resold by November 1, 1968 would be considered resold within a commercially reasonable time and § 2–706 would apply. However, for the securities that Bache and its customers retained and resold after November 1, 1968, months and years after ICC's breach of the tender offer, I cannot conclude that the securities were resold within a commercially reasonable time. To recover damages for these securities the plaintiff must look to § 2–708.

The issue of whether plaintiff gave defendant notification of resale of securities as required by § 2–706 can be handled briefly. Section 2–706(4) (b), supra, in particular requires that where there is a resale at a public sale, the seller must give the buyer reasonable notice of the time and place of resale. Official Comment 8 to § 2–706 explains that this was added to assure the buyer of a fair sale by giving him the "opportunity to bid or to secure the attendance of other bidders." Here, the purpose of notification has been fulfilled. Unlike in situations contemplated by the Code, the resales in this case were made on the national securities exchange, a market clearly fair to the buyer. Prior notice to the defendant would not have given it any greater opportunity to attend or purchase the securities. Provisions necessary to protect the buyer of goods are not always necessary to protect the buyer of listed securities. The purpose underlying § 2–706(4) (b) was fulfilled and I cannot rule that the notification provision was violated.

Defendant refers to a New York case, *Portal Gallaries, Inc. v. Tomar Products, Inc.*, 60 Misc.2d 523, 302 N.Y.S.2d 871 (Sup.Ct. Monroe Co. 1969), which held that plaintiff's lack of notification of its intention to resell paintings violated § 2–706. However in *Portal Gallaries*, supra, the sale was of paintings (goods) at a private sale. Notification was thus crucial in order that defendant might be able to attend the sale, bid, and secure other bidders to attend. In this present case, the sale was a public sale, made on a national securities exchange; notice to the defendant would not have given it any greater opportunity to attend or purchase the securities.

Hence, plaintiff substantially conformed with the notification provision. Therefore, only those securities that were sold after a commercially reasonable time (one month) fall outside of § 2–706. In order to recover for those securities, plaintiff must look to § 2–708 for the measure of damages.

### (2) § 2–708

Since plaintiff cannot recover under § 2–706 for securities resold after November 1, 1968, Bache must look to the remedy provided in § 2–708. Subsection (3) of § 2–709 and the practice commentary following § 2–706 and § 2–708 make it clear that if the seller cannot recover under § 2–706 or § 2–708 the seller, nevertheless, shall be awarded damages for non-acceptance under § 2–708. Practice Commentary, New York

Uniform Commercial Code, § 2–706, at 592 (McKinney 1964); Practice Commentary, New York Uniform Commercial Code, § 2–708, at 604–605 (McKinney 1964).

Section 2–708(1) provides that the measure of damages for nonacceptance by the buyer is the difference between the market price at the time and place of tender and the unpaid contract price together with any incidental damages. Section 2–708(1) is as follows:

"Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach."

Subsection (2) of § 2–708 provides an alternative measure of damages, but it is not applicable in this case.

### (C)  COMMISSIONS

■  Section 2–710 of the New York UCC provides that the seller, after the buyer's breach, can recover incidental damages, such as any commercially reasonable charges, expenses, or commissions incurred in the resale of the goods. The section reads as follows:

"Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

This section applies to both § 2–706 and § 2–708 (see § 2–706(1) and § 2–708(1)) and would permit the seller to recover the commissions due him as a result of defendant's breach of the tender offer (see Finding 13).

### (D)  INTEREST

■  Since New York law applies, Section 5001(a) and (b) of the New York Civil Practice Law and Rules (CPLR) would permit plaintiff to recover prejudgment interest. Section 5001 (a) and (b) is as follows:

"§ 5001.  Interest to verdict, report or decision

"(a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's decision.

"(b) Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."

Under § 5001(b) interest shall be computed from the earliest ascertainable date the cause of action existed. In this case, the date is October 2, 1968, when ICC breached the tender offer. For the unsold securities Bache can recover the interest on the tender price. For the securities resold during a commercially reasonable time, i. e., by November 1, 1968, plaintiff can recover interest on the difference between the tender price and the resale price. For the securities resold not during a commercially reasonable time, after November 1, 1968, plaintiff can recover interest on the difference between the tender price and the price at the date of the breach of the tender offer. Plaintiff is also entitled to interest on the commissions. Conse-

quently, interest is to be awarded on the total damage award.

## III. COMPUTATION OF THE MEASURE OF DAMAGES FOR UNSOLD AND RESOLD SECURITIES

Since we have established what the standard of damages will be under the New York UCC, I now apply the different provisions of the law to the specific facts of this case.

### (A) UNSOLD SECURITIES

(1) As to the 4,732 unsold shares of ELS held by Bache for its customers (see Finding 9), plaintiff may recover the full tender price provided under § 8–107 (2) of the New York UCC. Defendant's arguments that 993 shares should be excluded from recovery because Bache's customers requested that those shares be redelivered to them thus revocating Bache's authority to sue for those customers are not valid. This court's opinion on liability already decided that Bache could sue on behalf of its customers for their shares (see Finding 5). Therefore, plaintiff can recover $39 per share for the 4,732 shares which totals $184,548.

(2) As to the remaining 2,148 unsold shares being held in Bache's Exchange Section (see Finding 10), plaintiff can recover the full tender price provided under § 8–107(2) of the New York UCC. Defendant objects to any recovery for these shares, but this issue again was decided by this court in its decision on liability. The 2,148 shares were used for bookkeeping purposes in Bache's Exchange Section and regardless of the transactions that went on with these shares within that Section, defendant still is liable for the 2,148 shares. Therefore, plaintiff can recover $39 per share for the 2,148 shares which totals $83,772.

(3) As to the 28 unsold debentures held by Bache for its customers (see Finding 12), plaintiff can recover the full tender price provided under § 8–107 (2) of the New York UCC. Defendant's argument that the redelivery of the 14 debentures by Bache to its customers at their request constituted a revocation of Bache's authority to sue for the customer is contrary to this court's decision on liability (see Finding 5). Plaintiff can recover the full tender price of $1,236 for each of the 28 debentures which totals $34,608.

### (B) RESOLD SECURITIES

(1) As to the 15,869 shares resold by Bache for its customers (see Finding 9), for the 1,283 shares that were resold within a month after the breach of the tender offer, by November 1, 1968, Bache can recover damages under § 2–706, the difference between the tender price, $39, and the resale price. For the 14,586 shares that were resold after November 1, 1968, plaintiff can recover damages only under § 2–708(1), the difference between the market price at the time and place for tender and the unpaid contract price. Both sections permit the inclusion of any incidental damages allowed under § 2–710, but less expenses saved in consequence of buyer's breach.

Defendant contends that there should be no recovery with respect to the 1,712 shares redelivered by Bache to their customers at the customers' request after suit was instituted, since such request constitutes a revocation of Bache's authority to sue for the customer. Again, this objection is without merit. This court in its decision on liability held that Bache was the proper party to bring this action on behalf of its customers (see Finding 5).

(2) As to the 403 partially resold shares (see Stipulation of Facts with Respect to Damages, October 7, 1971, Ex. A), the measure of damages will be the same as the unsold and resold securities already discussed. For the unsold shares, plaintiff is entitled to recover the tender price, $39. For the resold shares, all resold after November 1, 1968, plaintiff is entitled to recover only the difference between the tender price, $39, and the market price at the time and place for tender, $30.50.

(3) As to the 7,100 shares held by Bache in its arbitrage account and later

resold (see Finding 10), plaintiff can recover only under § 2–708. Since the shares were not resold until January 1970 (see Stipulation of Facts with Respect to Damages, October 7, 1971, Ex. E), over one year after the breach of the tender offer, clearly not within a commercially reasonable time, the recovery would be the difference between the market price at the time and place for tender $30.50, and the unpaid contract price, $39, together with any incidental damages provided in § 2–710, but less expenses saved in consequence of buyer's breach. This amount totals (7,100 x $8.50) $60,350.

(4) As to the 14 debentures resold by Bache for its customers (see Finding 12), for the one debenture that was resold within a month after the breach of the tender offer, by November 1, 1968, Bache can recover damages under § 2–706, the difference between the tender price, $1,236, and the resale price. For the 13 debentures that were resold after November 1, 1968, plaintiff can recover damages only under § 2–708(1), the difference between the market price at the time and place for tender, $1,050, and the unpaid contract price, $1,236. Both sections permit the inclusion of any incidental damages allowed under § 2–710, but less expenses saved in consequence of buyer's breach.

Defendant contends that there should be no recovery with respect to the five debentures redelivered by Bache to customers at customers' request after suit was instituted, since such request constitutes a revocation of Bache's authority to sue for the customer. This objection is without substance. I have already held in the decision on liability that Bache is the proper party to bring an action on behalf of its customers (see Finding 5).

### (C) COMMISSIONS

Defendant does not question that plaintiff is entitled to recover from defendant the commissions due as specified in the tender offer. This amount, $.70 per share of stock and $22.19 per debenture (see Finding 13), would come to $21,454.30 and $931.98 respectively.

However, subsequent to the breach of the tender offer, Bache received brokerage commissions for the sale of some of the securities aggregating $5,176.76 (see Stipulation of Facts with Respect to Damages, October 7, 1971, at 2). Defendant maintains that Bache must deduct this amount from the total commission fee since it would constitute a double commission. Defendant contends that Bache would receive a double commission from the same source, one commission based on what Bache would have received if the tender offer was accepted and another commission derived from the customer's subsequent disposition of the same security.

This court cannot agree with defendant's contentions. Plaintiff may receive an additional amount since it has performed two distinct services. Defendant concedes that plaintiff is entitled to the commission for its services on the tender offer. Subsequent to this, Bache provided a completely different service for its customers and should be compensated also for that.

There is one situation where a broker cannot recover an additional amount. In a Washington case, although the facts are not clear, a broker negotiated a sale, induced the buyer who consented to surrender on the contract, and then negotiated a new sale. The Supreme Court of Washington held that the broker was not entitled to a double commission. Forrer v. John Davis & Co., 92 Wash. 452, 159 P. 696 (1916). In our present action the situation is different. Here plaintiff in no way induced or tried to get defendant to surrender on the tender offer. Defendant breached the tender offer and is liable for the full commission fees under that agreement. Defendant is liable to plaintiff for $22,386.28.

### (D) RATE OF INTEREST

Section 5004 of the New York CPLR provides that "interest shall be at the legal rate, except where otherwise prescribed by statute." The legal rate of

interest is defined in the New York General Obligations Law, McKinney's Consol.Laws, c. 24–A, § 5–501 (as amended in 1968), as the rate prescribed by the banking board pursuant to section 14–a of the New York Banking Law, or if no rate has been so prescribed, then 6%.

Section 14–a of the New York Banking Law, McKinney's Consol.Laws, c. 2, gives the banking board the power to prescribe the rate of interest in response to changing economic conditions. This was held constitutional in Woodhouse, Drake and Carey Limited v. Anderson, 61 Misc.2d 951, 307 N.Y.S.2d 113 (Sup. Ct.N.Y.1970). The maximum rate of interest prescribed by the banking board in this section was 7¼% from July 1, 1968 to February 15, 1969 and 7½% from February 16, 1969 to the present. See 3 New York Codes, Rules and Regulations, General Regulations of the Banking Board, § 4.1 (1970). This maximum rate has been the rate of interest that New York courts apply. Rachlin & Co. v. Tra-Mar, Inc., 33 A.D.2d 370, 308 N.Y.S.2d 153 (1970); Jamaica Sav. Bank v. Giacomantonio, 59 Misc.2d 704, 300 N.Y.S.2d 218 (1969). See also Supplementary Practice Commentary, New York CPLR, § 5004, (McKinney 1963).

In the present action, following the precedent of the New York courts, plaintiff can recover a rate of interest on the total amount of damages of 7¼% from October 2, 1968, the time of breach of the tender offer to February 15, 1969 and 7½% from February 16, 1969 to date.

### (E) NONE OF DEFENDANT'S CONTENTIONS FOR EXCLUDING CERTAIN CUSTOMERS OF BACHE FROM RECOVERY ARE VALID

Defendant proposes that certain customers of Bache should be excluded from recovery. I disagree.

■ First, four of Bache's customers, No. 88—The Village Fund, No. 91—Gold, No. 137—Maziroff, and No. 145—Manisoff, hold 700 shares and have instituted their own litigation for damages *against plaintiff* with respect to the tender offer. Defendant is an additional defendant in the Gold action. (Stipulation of Facts with Respect to Damages, October 7, 1971, at 3.) There seems to be absolutely no reason for excluding these customers' shares from recovery. This court has already held that Bache is the real party in interest and can bring this action for its customers. Only if defendant can show that it has paid any of the customers money in their suits, may it then be entitled to a reduction in the amount of the judgment. Defendant makes no such claim.

■ Second, eight additional customers of Bache have litigated for damages in Neuman v. Electronic Specialty Co., No. 68 C 1817 (N.D.Ill.) and have recovered $2,120.62. (See Stipulation of Facts with Respect to Damages, October 7, 1971, at 4; Defendant's Letter to the Court, dated October 18, 1971, pursuant to the Stipulation of October 7, 1971, attached with the "Order Approving Settlement and Awarding Counsel Fees" and the "Settlement Agreement.") That lawsuit was based on a wholly different theory of recovery (see "Settlement Agreement," at 2) and was against Electronic Specialty Co. Moreover, it is not clear whether the securities recovered in the Neuman case are the same securities sought in this action. Proof is not adequate here to exclude these customers from recovery.

■ Third, defendant claims that one customer, Rose Y. Aronowitz, had already been paid the tender price for her alleged 240 shares, as asserted by that individual in a letter to the United States District Court in Chicago on May 7, 1970. This letter was signed by Rose Y. Aronowitz, custodian for Joel A. Aronowitz. Although Bache maintains an account for Rose Y. Aronowitz as a custodian for Joel A. Aronowitz, Bache is not making a claim for securities in that account. The account for which Bache seeks recovery here is Mr. Gerald Aronowitz and Mrs. Rose Y. Aronowitz as joint tenants. These shares, therefore, appear to be different, though the number is the same. Again, defendant's proof as

to this issue is not adequate to preclude recovery.

Defendant's contentions for excluding certain customers of Bache from recovery are not persuasive and in instances are unsupported by adequate or convincing proof. This court must adhere to its decision on liability and rule that Bache can recover for its customers.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter under 28 U.S.C. §§ 1332 and 1441.

2. The law of the state of New York applies in the determination of damages.

3. Plaintiff is entitled to judgment for the total sum of $528,686.85, computed as hereinbefore stated in Finding 17, together with interest thereon from October 2, 1968, as hereinbefore directed in Finding 18, together with costs as taxed.

Settle judgment on notice pursuant hereto.