**MONOLITH PORTLAND CEMENT COMPANY, a corporation, Appellant,**

v.

**DOUGLAS OIL COMPANY OF CALIFORNIA, a corporation, Appellee.**

**No. 17036.**

United States Court of Appeals
Ninth Circuit.

Jan. 18, 1962.

As Amended on Denial of Rehearing
May 16, 1962.

For industrial use in California, proper governmental authority authorizes public gas suppliers to make contracts which provide for intermittent service. That is, when domestic demands are high (for example, on cold winter days) the industrial users are cut off, or down. Stated otherwise, the plan is that industry uses the overplus of natural gas not taken by domestic natural gas users. When an industrial user sustains a reduction or cut-off in the gas, if he must keep his plant going, he shifts to partial or complete use of oil. When the gas is again available, he cuts off the oil. Monolith had a gas contract with the Southern California Gas Company. Under this contract, Monolith was obligated to take a certain minimum amount.

On July 15, 1957, the parties entered into a contract for fuel oil which (excluding paragraph 2 on specifications of the oil) was as follows:

"Exhibit 'A'
"FUEL OIL SALES CONTRACT
"This contract entered into this 15th day of July, 1957, by and between Douglas Oil Co. of California, a California corporation, herein referred to as 'Seller', and Monolith Portland Cement Company, herein referred to as 'Buyer',

"Witnesseth:
"1. Term: That upon the terms and conditions herein set forth, Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase and receive from Seller the quantities of Bunker C Fuel Oil Specified in Paragraph three (3) for a period of ten (10) months commencing August 1, 1957, and ending May 31, 1958. A contract extension of two (2) months from June 1, 1958 through July 31, 1958 may be exercised by the Buyer by giving written notice to the Seller thirty (30) days prior to May 31, 1958.

"2. Specifications: * * *

"3. Deliveries: Seller agrees to deliver all fuel oil sold hereunder in-

Joseph T. Enright, Norman Elliott, Bill B. Betz, Los Angeles, Cal., for appellant.

Goggin, Tollefsen & Bumb, Robert L. Tollefsen, Los Angeles, Cal., for appellee.

Before CHAMBERS, JERTBERG and MERRILL, Circuit Judges.

CHAMBERS, Circuit Judge.

Monolith operates a cement plant near Tehachapi, California. Douglas is an oil producer. One of its products is commercial fuel oil, a residue in distillation of petroleum. Monolith's plant, as all cement plants, needs fuel to make the clinkers that ultimately become cement. The Tehachapi plant has dual firing equipment. Sometimes natural gas is used and other times it is fuel oil.

to Buyer's receiving facilities at Monolith, California. All such deliveries shall be made with reasonable promptness and dispatch upon notification of Buyer's fuel requirements. Seller agrees to supply and Buyer agrees to purchase a minimum of 200,000 barrels and a maximum of 300,000 barrels of Bunker C Fuel Oil for the contract period and extension period, which is one year from August 1, 1957. Buyer agrees to take delivery of a minimum of 10,000 barrels per month commencing with the month of September, 1957. Seller shall not be required, except at its option, to deliver more than 30,-000 barrels during any one calendar month. Seller shall not be obligated to make any deliveries hereunder unless in transport tank truck and trailer quantities.

"4. Price: Buyer agrees to pay to Seller for all fuel oil purchased hereunder the sum of $3.1425 per barrel plus all State and Federal taxes applicable to said sales, which price is F.O.B., Buyer's Monolith plant. In the event that during the term of this agreement the price posted by Standard Oil Company of California for delivery of tank car quantities of Bunker Fuel at El Segundo, California, shall be increased or decreased, it is understood and agreed that the price per barrel to be paid by Buyer for all fuel oil purchased thereafter shall be increased or decreased in the same amount per barrel as the said posted price is increased or decreased. For reference purposes, the said posted price at El Segundo at the date of this agreement is $2.90 per barrel. In the event that during the term of this agreement the Railroad Tariff from Harpertown, California to Monolith, California, published at Pacific South Coast Freight Bureau, Tariff 252, Item 8066, shall be increased, or decreased, it is understood and agreed that the price per barrel to be paid by Buyer for all

fuel oil purchased thereafter shall be increased or decreased in the same amount per barrel as the said published rail rate is increased or decreased. For reference purposes, the said published tariff, Item 8066, is $.08 cwt. which is $.2682 per barrel including tax. In the event that during the term of this agreement any new or increased rate of taxes shall be assessed by any governmental authority upon the product covered by this agreement, then Seller may increase the price of said product to the extent of the increase resulting therefrom

"5. Payment: Buyer agrees to pay in lawful money of the United States on or before the 15th day of each month for all fuel oil sold and delivered hereunder during the preceding calendar month. Time is of the essence and the failure of Buyer to make payment when due shall be cause for Seller to suspend deliveries hereunder until such payments are made or to terminate this contract if arrangements cannot be made that are mutually satisfactory to both parties.

"6. General Provisions: Nothing herein contained shall be deemed to limit the remedies of any party in the event of breach of this contract, and no waiver of any breach shall be deemed a waiver of any subsequent breach of the same or any other provisions hereof. This contract is the entire agreement between the parties, and no modification hereof shall be effective unless reduced to writing and signed by both parties hereto. This contract may not be assigned by either party nor by operation of law without the written consent of the other. Neither party hereto shall be liable for delays in shipment or failure to deliver or to receive deliveries, by reason of fires, floods, earthquakes, acts of God, wars, strikes, embargoes, necessary plant repairs or replacement of equipment, or any other cause whatsoever beyond the

control of such party, whether similar or dissimilar to the causes herein enumerated; and during such time as any of such causes prevent delivery or receipt of products hereunder, the operation of this agreement shall be suspended, but the term hereof shall not be extended by reason of any such suspension.

"In Witness Whereof, the parties hereto have hereunto set their hands the day and year first hereinabove set forth.

"DOUGLAS OIL CO. OF CALIFORNIA
"By W. G. KRIEGER,
"President
 "Seller
"MONOLITH PORTLAND CEMENT COMPANY
"By W. D. BURNETT,
"Vice President
 "Buyer"

In September, 1957, there was a letter modification with respect to performance as follows:

"September 26, 1957
"Mrs. M. E. Treanor, Purchasing Agent
"Monolith Portland Cement Company
"3326 San Fernando Road
"Los Angeles 65, California

"Dear Mrs. Treanor:

"I refer to the Fuel Oil Sales Contract dated July 15, 1957, between you as buyer and this company as seller and pertaining to the sale to you of certain quantities of Bunker C Fuel Oil during the ten month period commencing August 1, 1957, and ending May 31, 1958. The above mentioned contract provides that you agree to take delivery of a minimum of 10,000 barrels of the product each month commencing with the month of September, 1957. In our several recent conversations you have indicated a desire to be relieved of this obligation for the month of September, 1957.

"This matter has been considered, and I wish to advise that we will be agreeable to the waiver of your obligation to accept the above mentioned minimum quantity of the product during the month of September, 1957, provided that you agree to accept delivery of this 10,000 barrels during the months of October and November, 1957, in addition to the minimum deliveries which you are required to accept under the contract during each of these months. If this proposal is acceptable to you, please indicate your approval on the enclosed copy of this letter and return it to us, and we will then deem the contract to be modified to provide for no deliveries during September, 1957, and for deliveries aggregating a minimum of 30,000 barrels during the two months period consisting of October and November, 1957.

"Very truly yours,

"DOUGLAS OIL CO. OF CALIFORNIA
"C. S. McAuley,
"Manager
"Fuel Oil Division
"The Foregoing Modification is Approved.
"Monolith Portland Cement Company
"By W. D. Burnett (10/3/57)
"W. D. Burnett, Vice President"

In the fall and winter of 1957–1958 the demand for cement was weak in Southern California. Anticipated production schedules were curtailed. Monolith was unwilling (and it says physically unable) to take the minimum number of barrels of oil specified under paragraph 3 of the agreement. Monolith took the position that the contract was one for "requirements," that paragraph 6 either made it so or provided an excuse for not taking the minimum specified earlier in the contract.

As a shorthand method of abbreviating the facts, it may be stated that if Mono-

lith complied with its obligations under its gas contract during the winter of 1957–1958, which it did, it had use for much less oil than the specified minimum of the contract. But also it is a fact that if Monolith had cut off the gas, thus breaching its gas contract, it could have used up the minimum of oil provided under paragraph 3 of the Douglas contract.

■ The district court held that the Douglas contract was a maximum-minimum contract and not merely a requirements contract. It held there was no excuse for the breach and repudiation and, because the market price of oil had fallen below the contract price, awarded damages against Monolith. We agree with that judgment.

The record is long because the district court permitted abundant testimony and documents to come in about negotiations, contemporaneous documents, Monolith's obligation to buy gas, consumption of gas and production of cement. The greatest latitude in proof was indulged, but in the end much of it was excluded by the court from its consideration. We think the great mass of such evidence might better have been confined by the trial court to an offer of proof.

It is fair to say that Monolith was negotiating for a requirements contract. But the district court took the view that Monolith agreed to a maximum-minimum contract. The court thought Monolith did so because the oil market in July, 1957, was a seller's market.

Appellant has submitted a long brief in which it valiantly uses almost every piece of the record to try to break out of the agreement of July 15, 1957. We have examined the California cases [1] on construction of contracts and the California Civil Code and Code of Civil Procedure sections [2] on the subject, as we have before in other contract cases, and we are of the opinion that California would hold

the contract a maximum-minimum contract and that paragraph 6 provided no excuse. Appellant's excuse can be no more than its economic dreams did not come true, it could not buy the oil and observe its gas contract under its curtailed or unexpanded production and it had no place to put the oil. Suppose the situation had been reversed, the price of oil and the demand for cement had gone up. How long would we listen to Douglas say, "We sold oil we didn't have to sell and Monolith knew it. Clause 6 lets us out."?

As a force majeure clause, paragraph 6, as indicated, says:

"* * * [N]either party hereto shall be liable for delays in shipment or failure to deliver or to receive deliveries, by reason of fires, floods, earthquakes, acts of God, wars, strikes, embargoes, necessary plant repairs or replacement of equipment, or any other cause whatsoever beyond the control of such party, whether similar or dissimilar to the causes herein enumerated; * * *"

Appellant bears down too heavily on "[W]hether similar or dissimilar to the causes herein enumerated." We think the clause "or any other cause whatsoever beyond the control of such party" is the key. And we just do not think it insured against overpurchases of oil in the afterlight of a depressed cement market and a falling oil market. In our view, stronger language was required to reduce the agreement to a requirements contract. In other words, the clause was no escape for bad economic projecting.

Among its many defenses, Monolith offered fraud and mistake, and trade custom which it said changed the contract from maximum-minimum to a requirements contract. There was no fraud and the trial court found no mistake. And against the trade custom contentions we

1. e. g. Mayers v. Loews, Inc., 35 Cal.2d 822, 221 P.2d 26; Parnell v. Stanfield, 135 Cal.App.2d 804, 288 P.2d 118; Jennings v. Petrol Corporation, 87 Cal.App. 2d 63, 195 P.2d 899; also our Oregon

Plywood Sales Corp. v. Sutherlin Plywood Corp., 9 Cir., 246 F.2d 466.

2. e. g. California Civil Code, Sections 1625, 1642, 1647 and Civil Procedure, Sections 1856 and 1860.

cannot say the findings were clearly erroneous.

In February, 1958, an incident arose which appellant Monolith contends was an accord and satisfaction of the existing controversy which had arisen in the fall of 1957 whereunder Monolith had argued it was excused from taking any oil above its requirements.

The incident revolves around a purchase order dated February 13, 1958, of Monolith to Douglas for 7,416 barrels of oil at $2.82 per barrel. A total of 7,409.76 barrels was received and paid for. It is true that Monolith tried to make the order conditioned on Douglas accepting its construction of the contract. But we cannot find the necessary undisputed facts to find the accord and satisfaction as a matter of law.

Monolith attacks the damages. It argues that if there was a breach of the contract, it occurred long before suit was filed in May, 1958. It says under the doctrine of anticipatory breach one's damages become fixed as of the time of the breach or repudiation. This is important because generally during the term of the contract the price steadily declined downward. To calculate damages at the earliest possible date would be to the advantage of Monolith. However, Douglas is right that where the anticipatory breach doctrine obtains, it is one that is a privilege for the sufferer therefrom and not a burden.[3] He can seize it or ignore it, or wait awhile and then seize it. We cannot say that the court was wrong in determining that Douglas did not "accept" the repudiation until it filed suit.

Monolith claims it was charged for the oil in damages in the wrong months. In all, the trial court found that Monolith was chargeable with failure to take 154,266 barrels of oil and that the damage by reason of the falling market was $132,448.16. The court allotted the failures as 24,266 barrels before March 10, 1958, and 130,000 barrels after April 1, 1958. Monolith, if it must pay, would prorate its refusals throughout the term. To have an exact measure of what damages would be we would have to know the impossible: when Monolith would have taken the oil if it had taken it.

It would appear that the key to the correct measure of damages is to be found in a table prepared early in the cause by Douglas in answer to interrogatories. (That table is appended as a footnote.)[4] Monolith initially had no

3. Guerrieri v. Severini, 51 Cal.2d 12, 330 P.2d 635.

4. Answer: Plaintiff's (Douglas's) position and contentions with respect to the defendant's (Monolith's) obligation to purchase oil under the contract and the times and amounts of default by the defendant are shown in the following table:

| Month (1957) | Minimum Obligation | Quantity Delivered | Quantity of Default |
|---|---|---|---|
| July & Aug. | None | 9,380 | None |
| Sept. | None | None | None |
| Oct. & Nov. | 30,000 | 21,241 | 8,759 |
| Dec. | 10,620 | 283 | 10,337 |
| (1958) | | | |
| Jan. | 30,000 | 7,420 | 22,580 |
| Feb. | 30,000 | 7,410 | 22,590 |
| March | 30,000 | None | 30,000 |
| April | 30,000 | None | 30,000 |
| May | 30,000 | None | 30,000 |
| | 190,620 | 45,734 | 154,266 |

The minimum obligation shown above plus 9,380 barrels purchased during July and August, 1957, totals the contract minimum of 200,000 barrels.

182

obligation to take any oil in July and August, but it was obligated to take a total of 200,000 barrels by the end of May, 1958, and in no month after August, less than 10,000 barrels. Douglas was not obligated to deliver more than 30,000 in any month. Perhaps, it unilaterally could have waived this clause for its benefit and announced during the course of the term of performance that it might elect to deliver all undelivered oil, for example, in the last month. But it did not do so. And, so we do not reach the question. Further, as indicated, it did not elect to invoke anticipatory breach. Therefore, it is our judgment that Douglas may charge Monolith with a 30,000 barrel a month deficiency for each of the last three months of March, April and May; 22,590 for February; 22,580 for January; 10,337 for December; and 8,759 for October and November. Thus, the total of 154,266 barrels, the shortage, is accounted for. In our view, that gives Douglas its bargain. We do not now believe the events of performance gave it something better. While we cannot agree that the damages should be prorated through the term, we do believe the trial court allotted too much of the breaches to the last three months.

Although we give Monolith less than it basically contends for in the reduction of damages, we deem its specification of error adequate foundation for our result.

If the trial court deems it better to reopen the case to receive further evidence to enable it to make its computation of the damages within this court's view of the law, it should feel free to do so. Obviously, the scope of such inquiry would be rather limited.

■ Monolith claims that Douglas failed to mitigate its damages. That was the burden of Monolith to prove. The trial court was evidently not satisfied with its proof.

Monolith claims that the court's findings were bad—insufficient specificity. We have examined them and find them al-

most model. They state the ultimate facts found. They should not stop to measure every little facet of proof.

By the objective standards to be applied to it, we must hold Monolith to what we find its bad contract to have been.[5] Granted that its subjective intent was a requirements contract we cannot ignore what appear to be the plain meaning of words. Thus, we cannot uphold its Herculean efforts, and they were such, to get the contract it later thought it had or should have had.

The judgment is reversed for proceedings consistent with this opinion.

5. See California Civil Code, Section 1625.