**616**

**In the Matter of STERLING NAVIGA-
TION CO., LTD., Bankrupt.**

**Bankruptcy No. 75 B 1955.**

United States Bankruptcy Court,
S. D. New York.

Oct. 16, 1980.

Zalkin, Rodin & Goodman, New York City, for trustee.

Lord, Day & Lord, New York City, for Newfoundland Export & Shipping Co., Ltd.

EDWARD J. RYAN, Bankruptcy Judge.

On March 13, 1972, Sterling Navigation Co., Ltd. ("Sterling") entered into a shipping contract with Newfoundland Export & Shipping Co., Ltd. ("Newfoundland") whereby the parties agreed that a minimum of 17,000 long tons ("L/T's") of newsprint would be shipped by Sterling for Newfoundland at a rate of $41.00 per L/T. Clause 13 of the contract set forth the shipping dates as well as the minimum quantity to be moved at each date (See Exhibit A). Under this contract, Sterling shipped a total of 23,450 L/T's for Newfoundland. The contract also contained a provision, clause 14, which gave Newfoundland "the option of declaring a *similar* contract for 1973 at a rate not to exceed $41.00 per L/T." (emphasis added).

On January 26, 1973, Newfoundland telexed Sterling of the exercise of its option under clause 14. The telex provided for a minimum of 24,000 L/T's and set forth the shipping dates, the minimum quantity to be moved at each date and the February cargo. (See Exhibit B). In 1973 Sterling repudiated this contract and carried no cargo for Newfoundland. Consequently, Newfoundland utilized other shippers and was charged rates in excess of its contractual rate with Sterling. Newfoundland shipped a total of 41,588 L/T's of newsprint at rates ranging from $54.04 to $98.93 per L/T. (See Exhibit C).

As stipulated by the parties, the issue of liability and not damages was tried by Judge Louis Grossman on October 4, 1978. He found that "there existed a valid and binding option to be exercised by the plaintiff for the year 1973 . . . that plaintiff, Newfoundland Export, has properly exercised this option during the month of January, 1973 [and that] the defendant breached the agreement to allow plaintiff to exercise this option and that the plaintiff would be entitled to damages for such breach."

Sterling was adjudicated a bankrupt on December 17, 1975; hence, its trustee in bankruptcy defends against Newfoundland's claim.

At a hearing held on June 9, 1980, it was agreed that Newfoundland was to receive damages for the shipment of 28,450 L/T's of newsprint. This amount was determined based on an interpretation of the trial court's definition of "similar" contract to mean 5,000 L/T's above the prior year's shipments. Newfoundland asserts that the

measure of damages with respect to the 28,450 L/T's should be calculated based on the highest rate per ton paid in 1973. Sterling, on the other hand, asserts that such calculation "is contrary to the doctrine of mitigation requiring the injured party to a contract to seek to limit its damage as much as possible" and that the measure of damage should be calculated on the first 28,450 L/T's. Sterling also indicated a willingness to compromise on the average rate paid per L/T in 1973. (See Exhibit D [Highest, First, Average]).

The question presented is: On which 28,450 of the 41,588 L/T's shipped by Newfoundland should the damages be calculated?

The determination of which 28,450 units Newfoundland should be compensated for is crucial in the calculation of damages and, consequently, the amount Newfoundland may have allowed on its proof of claim. The measure of damages ranges from $515,927.40, utilizing the lowest rate paid per L/T in 1973, to $1,009,000.50, utilizing the highest rate paid per L/T in 1973. (See Exhibit D).

Neither the parties nor the court found case law precisely on point. McCormick discusses the calculation of damages for conversion of chattel and for breach of contract where the goods are of fluctuating value. *McCormick on Damages* § 48. He suggests that the courts have adopted three approaches for calculating the measure of damages in such situations. These are as follows:

1. "To disregard the subsequent change in value" and to take as the basis for the award the value of the property at the time it was converted, or at the time it should have been delivered under contract.

2. "To take as the basis for award the highest value reached from the time of conversion or breach down to the time of trial."

3. "To take as the basis for award the highest value reached during the period from the time when the plaintiff learned of the wrong down to the expiration of a reasonable time for securing on the market other similar goods."

*Id.* at 183–184, 185. The third alternative is referred to as the rule of highest replacement value and has been adopted in New York. *Jones v. National Chautauqua Country Bank,* 272 App.Div. 521, 74 N.Y.S.2d 498 (1st Dep't 1932); *Hall v. Bache,* 235 App. Div. 256, 256 N.Y.S. 693 (1st Dep't 1932). It has also been approved by the Supreme Court of the United States. *McCormick* citing *Gallagher v. Jones,* 129 U.S. 193, 200, 98 S.Ct. 335, 337, 32 L.Ed.2d 658. Since this measure of damages evolved from New York security conversion cases, a reasonable time has been interpreted by some New York courts to be between 7 days and 60 days. *Bache & Co. v. International Controls Corp.,* 339 F.Supp. 341, 351 (S.D.N.Y.), *aff'd* 469 F.2d 696 (2d Cir. 1972) (citations omitted). Although the security conversion cases may be distinguished from the instant case in that damages were awarded based upon the replacement value of securities which were not actually purchased, it is possible to apply the reasoning underlying those courts' computations of damages to the present case. In the calculation of damages in an action for violations of the Securities Exchange Act, the Tenth Circuit adopted the rule of highest replacement value. *Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90, 105 (10th Cir.), *cert. denied* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). In adopting this standard, the court explicitly rejected an award of the average price:

The averaging aspect is deleted to conform with what is considered the focal purpose: to award the reasonable investor in amount which offsets any loss he suffered by a deceitfully induced sale. To award an average price would not fully compensate him for a number of days within the reasonable period. . . . In selecting the highest daily price the advantage works, to a greater degree, against TGS [defendant]. But where, as here, the injury is suffered by an act making difficult the exact computation of

damages, the wrongdoer is not heard to complain. *Id.* at 105–106. Applying this reasoning to the instant case, the award of damages would be the highest rate per ton paid within a reasonable period. If one concludes that the term of the contract is a reasonable period, the award of damages would be $1,009,000.50 (See Exhibit D ["Highest"]). However, if one concludes that a reasonable period is the number of months in which the first 28,450 L/T's were shipped, then the award of damages would be $602,502.00 (See Exhibit D ["First"]). The fact that the 1972 contract and the 1973 telex renewal contemplated that shipments would be made throughout the year (shipping dates and minimum quantities to be moved were included) supports the position that a reasonable period is the full term of the contract. However, the fact that the telex renewal included instructions for the shipment of Newfoundland's first order as well as the fact that Mr. Leaman, at the June 9, 1980 hearing (pp. 10, 12), showed that he thought that Newfoundland had used Sterling exclusively for its shipping needs in 1972 support the position that Newfoundland's recovery should be limited to the first 28,450 L/T's shipped.

The case of *Monolith Portland Cement Co. v. Douglas Oil Co. of Cal. ("Monolith")*, 303 F.2d 176 (9th Cir. 1962), suggests another approach to the computation of damages. In that case, *Monolith* entered into a contract with Douglas for the purchase of fuel oil. The contract contained a minimum and maximum provision for the total quantity to be purchased/sold as well as monthly minimums and maximums. *Monolith* failed to take delivery of the minimum number of barrels of fuel oil. As a result of a decline in the price of oil during the contract period, the measure of damages would have been smaller had the calculations been based on the earlier months of the contract. For this reason, *Monolith* asserted that "under the doctrine of anticipatory breach, one's damages become fixed as of the time of the breach or repudiation." *Id.* at 181. The court, however, stated "that where the anticipatory breach doctrine obtains, it is one that is a privilege for the sufferer therefrom and not a burden." *Id.* (citation omitted). Consequently, the court awarded damages based upon the minimum quantity to be purchased over the term of the contract. This calculation was based on the difference between the amount purchased and the minimum amount required under the contract for the earlier months and the difference between the amount purchased and the maximum amount allowed under the contract for the later months. Thus, the burden of the decline in the price of oil was primarily placed on the breaching party.

A similar analysis should be and is applied to the instant case. Although the number of shipments set forth in the 1973 contract and the number of shipments actually made is not the same, it appears from the 1972 and 1973 contracts that under the 1973 contract it was contemplated that there would be several minimum shipments of 3,500 L/T's and a December minimum of 5,000 L/T's. Using these figures as a base quantity for each period and allocating the additional tonnage required to bring the total to 28,450 L/T's at the highest rates paid per ton results in damages of $994,420.60 (See Exhibit E for calculations).

Newfoundland's claim is allowed in the sum of $994,420.60. It is so ordered.

EXHIBIT A

| Shipment | Quantity | |
|----------|----------|---|
| March 1972 | 3,000 L/T | |
| June 1972 | 3,000 L/T | |
| August 1972 | 3,000 L/T | |
| October 1972 | 3,000 L/T | |
| December 1972 | 5,000 L/T | |
| | 17,000 L/T | TOTAL |

EXHIBIT B

| Shipment | Quantity | |
|----------|----------|---|
| February 1973 | 3,500 L/T | |
| April 1973 | 3,500 L/T | |
| June 1973 | 3,500 L/T | |
| August 1973 | 3,500 L/T | |
| October 1973 | 3,500 L/T | |
| December 1973 | 5,000 L/T | |
| | 22,500 L/T | TOTAL |

February Cargo – 4,834

EXHIBIT C

EXHIBIT D

SUMMARY OF CALCULATIONS

| Shipment | Quantity | Rate per L/T | Method of Calculation | Amount of damages |
|---|---|---|---|---|
| 3/31/73 | 9,324 L/T | $54.04 | Lowest | $515,927.40 |
| 5/29/73 | 8,552.9 L/T | 56.30 | First | 620,502.00 |
| 8/3/73 | 8,129 L/T | 80.79 | Pro-Rata | 813,042.78 |
| 8/9/73 | 7,299 L/T | 59.25 | Average | 881,042.70 |
| 12/19/73 | 8,283 L/T | 98.93 | Highest | 1,009,000.50 |
| | 41,587.9 | | | |

EXHIBIT E

| Date | Base Quantity | Additional Allocation | Total | Rate | Amount |
|---|---|---|---|---|---|
| 3/31/73 | 3,500 L/T | – | 3,500 | $54.04 | $189,140 |
| 5/29/73 | 3,500 L/T | – | 3,500 | 56.30 | 197,050 |
| 8/3/73 | 3,500 L/T | 4,629 L/T | 8,129 | 80.79 | 656,741.91 |
| 8/9/73 | 3,500 L/T | 1,538 L/T | 5,038 | 59.25 | 298,501.50 |
| 12/19/73 | 5,000 L/T | 3,283 L/T | 8,283 | 98.93 | 819,437.19 |
| | | | 28,450 | | 2,160,870.60 |

Less 28,450 at contractual rate
  of $41.00                                          1,166,450.00
  TOTAL DAMAGES                                        994,420.60