The B.F. GOODRICH CO., Plaintiff,

v.

VINYLTECH CORPORATION, Defendant.

No. CIV 88–2020 PHX–RCB.

United States District Court, D. Arizona.

April 17, 1989.

C. Owen Paepke, Jim Wright, Ellen Keezer and Fennemore Craig, Phoenix, Ariz., for plaintiff.

Kevin P. Gallagher, Bryan, Cave, McPheeters & McRoberts, Phoenix, Ariz., John M. Edgar, Ronald L. Holt and Bryan,

Cave, McPheeters & McRoberts, Kansas City, Mo., for defendant.

## ORDER

BROOMFIELD, District Judge.

This case involves a classic breach of contract action between plaintiff B.F. Goodrich Company ("Goodrich") and defendant Vinyltech Corporation ("Vinyltech"). The matter is presently before the Court on Goodrich's motion for summary judgment and Vinyltech's cross-motion for summary judgment. The basic issue for purposes of these cross-motions for summary judgment is whether Vinyltech is obligated by contract between the parties, to purchase eight railcars of resin per month from Goodrich during the year 1989.

Goodrich is a supplier of poly vinyl chloride resin, an essential material for the manufacture of poly vinyl chloride ("PVC") pipe. Vinyltech is a manufacturer of PVC pipe. For approximately five years, Goodrich had supplied resin to Vinlytech. On January 21, 1988, Goodrich and Vinyltech entered into an agreement concerning Goodrich's supply of resin to Vinyltech ("Agreement"). The Agreement was part of a settlement between the parties arising out of a lawsuit filed by Vinyltech against Goodrich in which Vinlytech sought to prevent Goodrich from discontinuing their supply arrangement. Under the Agreement, Goodrich was obligated to supply eight railcars of resin per month to Vinyltech during 1988 at market price. The Agreement also contained several other provisions, the interpretation of which form the basis of the current dispute between the parties. Since resolution of the issues in this dispute necessarily involves the interpretation of these provisions, they are set forth in relevant part.

1. *Commitment to Supply Resin to Vinyltech:* BFG agrees to supply Vinyltech with PVC pipe resin in the quantities and on the terms and conditions set forth hereinafter:

(A) *1988 Resin Supply:* During 1988, BFG will ship to Vinyltech 96 railcars of resin, eight cars per month....

\*     \*     \*     \*     \*     \*

(ii) *Alternative Supply Offers:* During 1988, Vinyltech shall be obligated to accept any alternative offer of resin of comparable type and quality, *if* the price is lower than or equal to the price stated above. Any volumes accepted from an alternative supplier (other than Occidental) shall reduce BFG's volume commitment on a pound-for-pound basis....

(B) *1989 Resin Supply:* BFG hereby grants Vinyltech the option to obtain resin supply from BFG in 1989 in monthly and annual volumes equal to those specified for 1988, in paragraph 1(A) hereinabove. Vinyltech must exercise this option in writing on or before October 1, 1988. Failure to exercise the option shall relieve BFG of any further supply obligation to Vinyltech. If the option is exercised, BFG shall be obligated to ship Vinyltech 96 railcars of resin during 1989, eight cars per month, at an average weight of 170,000 pounds per car, for a total of 1,360,000 pounds of resin per month.

\*     \*     \*     \*     \*     \*

(ii) *Take or Pay:* Vinyltech's obligation for 1989 pursuant to the October 1, 1988 option is a take-or-pay obligation, subject to the *"Force Majeure"* provision outlined in paragraph 1(F) hereinbelow.

\*     \*     \*     \*     \*     \*

(F) *Force Majeure:* In the event Vinyltech exercises the October 1, 1988 option recited in paragraph 1(B) hereinabove, Vinyltech's take or pay obligation for 1989 shall be limited by the "Force Majeure" provision contained in BFG's standard resin supply contract, a true and accurate copy of which is attached hereto as Exhibit "A." ... Vinyltech shall given [sic] BFG written notice of the occurrence of any "Force Majeure" condition or of its cessation of production, within seven (7) days of the occurrence of the same.

Review of the Agreement indicates that under paragraph 1(A)(ii), if Vinyltech received, at any time during 1988, an alternative offer of resin of comparable type and

quality from another company at a price equal to or lower than the price then being charged by Goodrich, Vinyltech "shall be obligated to accept" the alternative offer.

Paragraph 1(B) of the Agreement granted Vinyltech the option to obtain resin from Goodrich during 1989 at the same volume as in 1988 but at a higher price, *i.e.*, the posted price plus two cents per pound. This paragraph further provided that if Vinyltech decided to accept this offer, it had to "exercise this option in writing on or before October 1, 1988."

Paragraph 1(B)(ii) of the Agreement contained a "take or pay" clause. Specifically, Vinyltech's obligation for 1989 pursuant to the October 1, 1988 option was a take-or-pay obligation subject to the "Force Majeure" provision contained in paragraph 1(F). Paragraph 1(F) provides that in the event Vinyltech exercises its 1989 resin supply option, its take or pay obligation for 1989 would be limited by the "Force Majeure" provision contained in Goodrich's standard resin supply contract.

The events leading up to the current dispute began on September 21, 1988, when Vinyltech exercised in writing its 1989 resin supply option pursuant to paragraph 1(B) of the Agreement. Thereafter, in December, 1988, Vinyltech received an offer and entered into an agreement to purchase resin from Shintech, Inc. ("Shintech Agreement"). Under the terms of the Shintech Agreement, Vinyltech agreed to purchase from Shintech, eight railcars of resin for the month of December 1988 and the same volume for every month in 1989. Vinyltech claims that the Shintech Agreement called for a purchase price for December 1988 equal to that in the Goodrich Agreement and lower than that in the Goodrich Agreement for all of 1989. As a result, Vinyltech contends that under paragraph 1(A)(ii) of the Goodrich Agreement, it was obligated to enter into the new agreement with Shintech.

By letter dated December 6, 1988, Vinyltech notified Goodrich of the Shintech offer and resulting agreement and informed Goodrich that it was cancelling the orders previously placed by Vinyltech for resin to be shipped in December 1988 and for all of 1989.

Subsequently, Goodrich notified Vinyltech that acceptance of the Shintech offer did not relieve Vinyltech of its contractual obligations to Goodrich in light of Vinyltech's acceptance of the 1989 resin supply option which specifically included a take or pay obligation on the part of Vinyltech. The parties, being unable to resolve their differences by non-judicial means, have now turned to the Court in an effort to resolve the dispute.

## SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the record establishes that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish both that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356–1357, 89 L.Ed.2d 538 (1986). The moving party may discharge this burden by showing there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party opposing a motion for summary judgment cannot rest upon his mere allegation or denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986).

Under recently enunciated standards set forth by the United States Supreme Court, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material

fact. *Anderson, supra,* 106 S.Ct. at 2514. A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.,* 106 S.Ct. at 2510.

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.,* 106 S.Ct. at 2511.

## ANALYSIS

Goodrich's position in this matter is relatively clear and straightforward. Paragraph 1(B) of the Agreement required Vinyltech to give notice by October 1, 1988 whether it wished to receive resin from Goodrich in 1989. Goodrich claims that Vinyltech's exercise of this option created a "take or pay" obligation on the part of Vinyltech to either purchase and take or else pay for eight railcars of resin per month in 1989. Goodrich argues that having exercised this option, Vinyltech cannot now cancel its commitment by virtue of Shintech's competitive offer for resin for the month of December, 1988. Goodrich contends that Vinyltech's cancellation of the 1989 resin supply agreement constitutes a breach of contract and entitles Goodrich to terminate the contract and immediately resort to any remedy for the breach. Goodrich argues that under the clear and unambiguous language of the contract, it is entitled to summary judgment as a matter of law on the issue of Vinyltech's liability for breach of contract.

Vinyltech, of course, has a different view of the matter. In support of its cross-motion for summary judgment, Vinyltech argues that by its very terms, the Agreement was terminated when Vinyltech received a more competitive offer from Shintech. Vinyltech claims that paragraph 1(A)(ii) of the Agreement obligates Vinyltech to accept any competitive alternative offer of resin of comparable type and quality during 1988. According to Vinyltech, the Shintech offer was just such a comparable offer. Vinyltech claims that in order to accept Shintech's comparable offer for the month of December 1988, as it was obligated to do, Vinyltech also had to contract with Shintech to purchase Shintech resin during 1989. As a result, Vinyltech asserts that the Shintech offer constituted a specified condition or event under the Agreement which terminated and cancelled both Goodrich's obligations to sell and Vinyltech's obligations to buy resin in December 1988 and throughout 1989.

Alternately, Vinyltech argues that if the Court does not find, as a matter of law, that Vinyltech's obligation to purchase resin from Goodrich under the Agreement was and is terminated, genuine issues of fact preclude granting Goodrich's motion for summary judgment. Specifically, Vinyltech argues that first, the Agreement is ambiguous because it contains conflicting terms and as such, the intent of the parties must be determined. Vinyltech contends that such an inquiry is a factual rather than a legal determination thus precluding summary judgment on this issue. Second, Vinyltech claims that its contractual obligations to Goodrich were terminated by reason of the Agreement's "force majeure" provision and/or commercial impracticability or frustration of performance. Finally, Vinyltech claims that its duty to purchase resin from Goodrich was terminated by Goodrich's prior material breach of the Agreement.

In determining the meaning or validity of the Agreement between the parties, the Court must look to Arizona state substantive law governing contracts. The Court's first determination for purposes of the present cross-motions for summary judgment is whether the terms of the Agreement are clear and unambiguous. Whether the terms of an agreement are ambiguous is a question of law. *Sun–Air Estates, Unit 1 v. Manzari,* 137 Ariz. 130, 669 P.2d 108 (App.1983). Contract language is ambiguous only if it can reasonably be given more than one meaning. *McCutchin v. SCA Services,* 147 Ariz. 234,

236, 709 P.2d 591, 593 (Ariz.App.1985). The mere fact that the parties disagree as to the meaning of language contained in the agreement is not sufficient to create an ambiguity. *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 258, 681 P.2d 390, 410 (App.1983).

■ Vinyltech's first argument in opposition to Goodrich's summary judgment motion is that the Agreement is ambiguous and therefore the Court must go beyond the actual terms to inquire into the facts and circumstances at the time the contract was made. In this instance, however, the Agreement is clear and unambiguous. Paragraph 1(B) of the Agreement gave Vinyltech the option to purchase resin from Goodrich in 1989. Vinyltech was required to give notice by October 1, 1988 whether it wished to exercise its option. Vinyltech did in fact give Goodrich the requisite notice, thereby accepting Goodrich's offer. As a result, a binding contract was formed with Vinyltech assuming a "take or pay" obligation to Goodrich to purchase eight railcars of resin per month throughout 1989.

The competitive offer provision for 1988 contained in paragraph 1(A)(ii) of the Agreement does not conflict with the option provision. Paragraph 1(A)(ii) only obligates Vinyltech to accept any alternative offer of resin of comparable type and quality during 1988. Under the terms of the provision, Vinyltech was obligated to accept Shintech's offer for the month of December 1988, but not for the year of 1989. Unfortunately for Vinyltech, the terms of Shintech's offer was conditioned upon Vinyltech also accepting resin in 1989. As a result, Vinyltech finds itself in the position of having two contracts for the purchase of resin in 1989. Although a harsh result, it is also a result perfectly consistent with the clear language of the contract. After having exercised the option provision in the Agreement, Vinyltech was contractually committed to purchasing resin from Goodrich in 1989. That obligation was not rescinded or terminated when Vinyltech accepted Shintech's offer for resin for 1989. Because the contract clearly provides for this result, the Court need not look beyond the terms of the contract in deciding this issue. If the meaning of a contract can be determined from the four corners of the document and cannot reasonably be construed in more than one sense, extraneous documents or circumstances are irrelevant and the court must give effect to the language of the agreement. *United Cal. Bank, supra,* 681 P.2d at 410.

■ Vinyltech's second argument is that the Agreement's force majeure provision explicitly terminates Vinyltech's obligation to purchase resin from Goodrich in the event of an occurrence reasonably beyond the control of Vinyltech. Vinyltech contends that the drastic and unexpected fall in market prices for PVC pipe was just such an event. Vinyltech claims that this change in market conditions was beyond its control and economically precludes Vinyltech from continuing to purchase resin from Goodrich.

The force majeure provision is contained in paragraph 11 of Goodrich's standard resin supply contract. It provides in pertinent part:

Either party shall be relieved from liability hereunder for failure to perform any of the obligations herein imposed, except the obligation to pay for product already delivered, for the time and to the extent of such failure to perform, if Buyer's failure to take, use or consume, or Seller's failure to make delivery, is occasioned by: (1) Acts of God, fire, explosion, flood, hurricanes; (2) Strikes, lockouts or other industrial disturbances or riots; (3) War, declared or undeclared; (4) Compliance with any federal, state, municipal or military law, regulation, order or rule, foreign or domestic, including priority, rationing, allocation or preemption orders or regulations, or cancellation of Seller's or Buyer's license to operate its plant; (5) Shortage or breakdown or other failure of facilities used for manufacture or transportation, shortage of labor, power, fuel or raw products; (6) Total or partial shutdown due to Seller's plant turnaround; (7) *Or any other cause or causes of any kind or character reasonably beyond the con-*

*trol of the party failing to perform, whether similar to or dissimilar from the enumerated causes (any such cause herein called "force majeure")* (emphasis added).

There is no dispute as to the non-applicability of the first six subparts. Rather, the key language is subpart 7 which provides that a force majeure event may consist of "any other cause or causes of any kind or character reasonably beyond the control of the party failing to perform...." Vinyltech claims that this clause includes changes in market conditions since the fall in prices for PVC pipe was an event beyond its control.

Goodrich's position is that the force majeure provision does not extend to changes in market conditions which make it more expensive for the buyer to perform. Goodrich cites several federal cases in support of this proposition. In *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir.1986), the court held that a contract's force majeure provision did not extend to a change in market conditions.

> A *force majeure* clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed-price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller ...; if it falls, as here, the seller gains at the expense of the buyer.

*Id.* at 275. *Accord Langham Hill Petroleum, Inc. v. Southern Fuels Co.*, 813 F.2d 1327, 1330 (4th Cir.1986), *cert. denied* — U.S. ——, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987); *U.S. v. Panhandle Eastern Corp.*, 693 F.Supp. 88, 96 (D.Del.1988).

Vinyltech argues that the language of the force majeure clauses in the cases cited by Goodrich is not applicable to this case because those contracts or agreements do not contain language similar to the force majeure clause in the Agreement between Goodrich and Vinyltech. Vinyltech specifically refers to the language of the force majeure provision providing for cancellation or termination of the Agreement in the event of the occurrence of "any other cause or causes reasonably beyond the control of Vinyltech." Review of the cases cited by Goodrich indicate that the force majeure clause in those cases all contain language similar to or reasonably analogous to the language of the force majeure clause in this case. For instance, in *Northern Indiana*, the force majeure clause held by the court to be inapplicable to changed market conditions, permitted the buyer to stop taking delivery of coal "for any cause beyond [its] reasonable control ... including but not limited to ... orders or acts of civil ... authority...." *Id.* at 274. Likewise, in *Langham Hill Petroleum*, the court ruled that severe price fluctuations did not fall within the scope of a force majeure clause containing the words "or any other cause of any kind not reasonably within its control." *Id.* at 1329.

Consequently, the Court is satisfied that other federal courts have interpreted substantially the same force majeure clause at issue in this case as not extending to severe price fluctuations and/or changes in market conditions. The question remains as to the weight or significance to be accorded these federal cases from the Seventh and Fourth Circuits in interpreting this particular force majeure clause. As previously stated, this Court must first look to Arizona law when interpreting a contract negotiated and entered into in Arizona. The parties do not cite any Arizona cases dealing with force majeure provisions and indeed this Court's research fails to uncover any. Neither does the Court find any federal cases interpreting Arizona law on this particular issue.[1] Consequently,

---

1. Arizona courts frequently follow California courts in their interpretation of relevant law. In *Monolith Portland Cement Co. v. Douglas Oil Co. of Cal.*, 303 F.2d 176 (9th Cir.1962), the Ninth Circuit, construing California law, was presented with a similar factual situation as is presented in this case. There, the force majeure clause provided that "neither party hereto shall be liable for delays in shipment or failure to deliver ... by reason of fires, floods, earthquakes, acts of God ... or any other cause whatsoever beyond the control of such party, whether similar or dissimilar to the causes herein enumerated...." *Id.* at 180. In construing the force majeure provision, the court stated:

the Court must determine how the force majeure clause would be interpreted under Arizona law.

In the absence of statute or case law on the subject, Arizona courts often look to the Restatement when interpreting contract provisions. *See United Cal. Bank, supra,* 681 P.2d at 410. Although the Restatement (2d) of Contracts does not specifically address force majeure clauses, § 261 does provide for discharge of contractual duties by reason of supervening impracticability. This section states:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

This section providing for discharge by supervening impracticability incorporates the basis principle, if not language, of the force majeure clause contained in the Agreement. Comment b to § 261 states that "mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section." Based upon the Restatement, Arizona courts would likely find that the force majeure provision does not contemplate or incorporate market shifts or financial inability.

The Court concludes that under Arizona law, the force majeure clause in the Agreement would be construed by Arizona courts in much the same manner as the almost identically worded clause in *Monolith* and *Northern Indiana.* In other words, the unexpected drop in market prices for PVC pipe was not within the scope or contemplation of the language of the Agreement's force majeure provision.

██ In addition to arguing the applicability of the Agreement's force majeure provision, Vinyltech also contends that the changes in market conditions discharged the contract under the doctrine of commercial frustration. Under Arizona law, however, commercial frustration has not been treated as a blanket remedy for parties looking to discharge a contractual obligation on the basis of changes in price or market conditions. "[W]hile Arizona recognizes the doctrine of commercial frustration, ... we do not see fit to interpret it as a general absolution whenever performance under the contract becomes difficult or expensive." *Mohave County v. Mohave–Kingman Estates,* 120 Ariz. 417, 586 P.2d 978, 983 (1978). Proper application of the doctrine requires proof from the party seeking to excuse themselves from performance that the supervening frustrating event was not reasonably foreseeable. *Garner v. Ellingson,* 18 Ariz.App. 181, 501 P.2d 22, 24 (1972).

Price fluctuations and changes in market conditions are normal commercial risks fully understood as foreseeable occurrences by both parties to this type of contract. In fact, the very nature and terms of the Agreement in this case contemplates and provides for these types of occurrences. The purpose of the take-or-pay clause is to apportion the risks of production and sales between the buyer and seller. The seller bears the risk of production. To compensate seller for that risk, the buyer agrees to take, or pay for if not taken, a certain quantity of the product. The buyer bears the risk of market demand. *See Universal Res. Corp. v. Panhandle E. Pipe Line Co.,* 813 F.2d 77, 80 (5th Cir.1987).[2]

---

We think the clause "or any other cause whatsoever beyond the control of such party" is the key. And we just do not think it insured against overpurchases of oil in the afterlight of a depressed cement market and a falling oil market ... In other words, the clause was no escape for bad economic projecting. *Id.* at 180.

**2.** In a recent case from the Tenth Circuit, the court addressed a situation similar to the instant action in context of a contract for the sale and

purchase of natural gas. In *Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563 (10th Cir.1989), Producer's Gas Company (PGC), the purchaser under the contract claimed that the force majeure provision (containing almost identical language to the provision in question here) extended to a lack of demand for gas, thereby providing relief from the take-or-pay obligation contained in the contract. PGC argued that a force majeure event had occurred because the demand for gas sharply decreased,

Vinyltech cannot now contend for purposes of its commercial frustration argument that a change in prices or market conditions was not a reasonably foreseeable event. To the contrary, the parties considered those very possibilities when they included the take-or-pay obligation in the Agreement. Vinyltech has not shown that the change in prices or market conditions for PVC pipe was unforeseeable and consequently cannot now excuse its performance or forego its obligations under the Agreement on the basis of commercial frustration.

Vinyltech's third and final argument in opposition to Goodrich's summary judgment motion is that its contractual obligations with Goodrich were terminated as a result of Goodrich's prior material breach of the Agreement. Vinyltech contends that the resin it received from Goodrich during the late spring and early summer of 1988 was of inferior quality, was susceptible to "sunburning," had lower bulk density and caused production inefficiency. In addition, Vinyltech claims that Goodrich failed to provide technical assistance and instructions during 1988 as required under the terms of the Agreement. Vinyltech argues that Goodrich's failure to provide technical assistance amounted to an independent breach of contract by Goodrich and thus Vinyltech was justified in treating the Agreement as at an end.

■ Although there may be factual disputes regarding the quality of the resin supplied or the lack of technical assistance by Goodrich, they do not preclude the Court from granting Goodrich's motion for summary judgment. Even if Vinyltech received inferior resin or Goodrich failed to provide technical assistance in breach of the Agreement, Vinyltech's acceptance of the resin and failure to timely notify Goodrich of the alleged breach precludes rejection of the goods. A.R.S. § 47–2607(B). Where a tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." A.R.S. § 47–2607(C)(1).

Vinyltech claims that it provided notice to Goodrich on December 6, 1988 of Goodrich's alleged breach of the Agreement. However, the Goodrich's alleged breaches purportedly occurred during the summer of 1988. A substantial period of time lapsed and a number of shipments of resin were accepted by Vinyltech between the time Goodrich allegedly breached the Agreement and the time of Vinyltech's notification to Goodrich. Significantly, the date upon which Vinyltech notified Goodrich of the alleged breach of the Agreement was the same date Vinyltech notified Goodrich that it was rescinding the 1989 resin supply contract due to Shintech's alternative offer. Vinyltech's belated effort to terminate the 1989 resin supply contract with Goodrich by alleging Goodrich's prior material breach of the Agreement is, at this point, both disingenuous and self-serving.

As set forth herein, the terms of the Agreement between Vinyltech and Goodrich are clear and unambiguous. The contract calls for Goodrich to sell and Vinyltech to purchase eight railcars of resin per month for the year 1989. Furthermore, this contractual obligation has not been terminated or rescinded by reason of force majeure, commercial frustration or by Goodrich's alleged prior breach of the Agreement. Accordingly, there being no genuine issues of material fact regarding the language and terms of the Agreement,

with a corresponding decrease in the resale price of gas that the purchaser was obligated to take or pay for under the contract. The court held, however, that neither a decline in demand, nor an inability to sell gas at or above the contract price, constituted a force majeure event.

"PGC's interpretation of the force majeure provision is antithetical to the take-or-pay provision. Under its interpretation, PGC could be expected to take only when the demand for gas resulted in a resale price at or above the contract price. PGC could never be expected to take or pay when the demand for gas resulted in a resale price below the contract price. Rather than taking or paying under the take-or-pay provision, PGC would rely on the force majeure provision. Thus, Kaiser–Francis would be shut in during any drop in demand ... without any ability to sell in other markets. Such a one-side interpretation is suspect."

Goodrich's motion for summary judgment is granted. For the same reasons, Vinyltech's cross-motion for summary judgment is necessarily and expressly denied.

IT IS ORDERED granting plaintiff Goodrich's motion for summary judgment and denying Vinyltech's cross-motion for summary judgment.

IT IS FURTHER ORDERED that counsel for plaintiff shall lodge a proposed form of judgment within 10 days.